815 F.2d 1356
 22 Fed. R. Evid. Serv. 1744
 Alan BRADBURY, an individual, and Thom Panunzio, an
individual, Plaintiffs-Appellees,
v.
PHILLIPS PETROLEUM COMPANY, a corporation, and Phillips
Uranium Corporation, a corporation, Defendants-Appellants.
 No. 85-1877.
 United States Court of Appeals,
Tenth Circuit.
 April 7, 1987.
 
 John R. Vranesic of Moyer, Beal and Vranesic, Lakewood, Colo., for plaintiffs-appellees.
 John J. Mullins (Robert J. Kapelke and Catherine M. Meyer of Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo., and George M. Paulson, Jr. of Phillips Petroleum Co., Legal Div., Denver, Colo., with him on the briefs), of Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo., for defendants-appellants.
 Before HOLLOWAY, Chief Judge, and BARRETT and LOGAN, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 The defendants, Phillips Petroleum Company and Phillips Uranium Corporation (Phillips), bring this appeal from a final judgment entered upon a jury verdict in favor of the plaintiffs, Alan Bradbury and Thom Panunzio. Phillips appeals the denial of its motion in limine to exclude from evidence certain of the plaintiffs' exhibits and the jury's award to the plaintiffs of exemplary damages.
 
 
 2
 This case arises out of an altercation between employees for Desert Drilling Company and landowners in southwest Colorado during a large scale uranium exploration project run by Phillips Uranium Corporation. In the summer of 1980, Phillips Uranium Corporation was in the final stages of the three-year project in and around the town of Placerville in San Miguel County, Colorado. The operation involved drilling numerous assessment holes, five inches in diameter and as deep as five hundred feet, for the purpose of sampling and evaluating minerals in the area. Phillips retained the firm of Meuer, Serafina, and Meuer to survey the mining claims upon which the assessment drilling would take place and hired Desert Drilling Company to sink the holes.
 
 
 3
 In August, 1980, Desert Drilling personnel were in the process of drilling a hole on land they believed to be Lee Claim 74. Phillips had obtained permission to drill there from the investment company that owned the surface rights and from the United States Bureau of Land Management that owned the mineral rights. As a result of a surveying error, however, the drillers were in fact on land owned by one of the plaintiffs, Thom Panunzio, which bordered Lee Claim 74. Panunzio, who was at his home in New Jersey, had denied requests by Phillips for access to his land.
 
 
 4
 Plaintiff Alan Bradbury resided near Panunzio's property. He first noticed that the drillers were in the wrong place when he heard the noise of their machinery over the hill from his house and, thinking they were on his property, went to investigate. Bradbury, who knew that Panunzio did not want any drilling done on his land, told the Desert Drilling Company employees that they were in the wrong place. The drillers told Bradbury that they had been instructed to drill there by Cathy Suda, a geologist for Phillips Uranium Corporation, and that he should speak to her about it. Suda had been at the site earlier but had left for the day. Bradbury left a message with the drillers for Suda requesting that she stop by his house down the road so he could show her maps indicating they were on the wrong property. He also attempted to phone Suda at her room at the Telluride Lodge but was unable to reach her.
 
 
 5
 On August 19, 1985, Bradbury phoned Panunzio and apprised him of the situation. Panunzio asked Bradbury to determine for sure whether the workers were drilling on his property and reiterated that he did not want drilling on his land under any circumstances. The next day, Bradbury and Lee Proper, who held a fifty percent mineral interest in Panunzio's property, returned to the site. Proper told the drillers, "Boys, you are violating my claim." Bradbury took photographs of the drillers and their operation, then phoned Panunzio. Upon being informed that the drillers were indeed on his land, Panunzio became angry and hung up. After consulting with an attorney, Panunzio phoned Bradbury and asked him to return to the site to take more pictures.
 
 
 6
 When Bradbury returned to the drilling site on Panunzio's property he found Cathy Suda along with the drilling crew. Bradbury introduced himself to Suda and discussed the situation with her. After examining the map, Suda finally conceded that they might be on the wrong property. At that point, Bradbury asked Suda if he could take some pictures and explained that he was there on behalf of the land owner. Testimony conflicts as to whether Suda gave her approval for Bradbury to take pictures or simply said, "Don't take any pictures of me."
 
 
 7
 Bradbury then began taking photographs of the drilling operations. Bradbury testified that as he was taking a picture of the license plate of a Desert Drilling Company vehicle, one of the drillers approached him, asked what he was doing, and demanded the film from his camera. Bradbury refused, and when the drillers began advancing on him, he turned and ran.
 
 
 8
 Bradbury ran past Suda and up the road toward his property with three drillers in pursuit. Upon reaching his property line, he climbed the barbed wire fence and proceeded about fifty feet before stopping. Bradbury testified that as the drillers approached, he ordered them to stay off his property. Two of the drillers also climbed the fence, however, and demanded the film from his camera. When Bradbury again refused, a scuffle ensued in which Bradbury, who was wearing a brace to mend a broken collar bone, was pushed and jostled violently enough that his shirt was torn. Bradbury was briefly choked and strangled before the camera was wrestled away from him. The drilling company employees exposed the film and took the camera back to the drilling site. Suda asked the drillers to give her the camera and it was ultimately recovered from Suda by sheriff's officers. Suda, then eight weeks pregnant, took no part in the chase or scuffle.
 
 
 9
 As a result of these events, Bradbury brought suit against Phillips Petroleum Company and its subsidiary, Phillips Uranium Corporation, for trespass, assault and battery, and outrageous conduct. In particular, Bradbury complained that the scuffle caused him severe pain in his throat and injured shoulder as well as emotional distress. Panunzio also brought suit for trespass and outrageous conduct. A jury found in favor of both plaintiffs and awarded Bradbury $1 in actual damages for trespass, $1 in actual damages for outrageous conduct, $500 in actual damages for assault and battery, $50,000 in exemplary damages for outrageous conduct and $25,000 in exemplary damages for assault and battery. The jury awarded Panunzio $1,000 in actual damages for trespass, $10,000 in actual damages for outrageous conduct, $25,000 in exemplary damages for trespass and $50,000 in exemplary damages for outrageous conduct.
 
 
 10
 On appeal, Phillips raises four issues. First, Phillips maintains that the district court erred in permitting the jury to impose tort liability and punitive damages upon Phillips for the conduct of Desert Drilling Company personnel. It argues that Desert Drilling Company was an independent contractor and that the actions of the drilling personnel were outside the scope of their employment. Second, Phillips contends that the trial court erred in admitting exhibits and testimony regarding compromises of previous claims by landowners against Phillips. It argues that these settlements should have been excluded as compromises or offers to compromise pursuant to Fed.R.Evid. Rule 408 and should have been excluded as character evidence pursuant to Rule 404. Third, Phillips contends that the punitive damage awards should be reduced or set aside for being so excessive and disproportionate to the actual damages as to suggest bias or prejudice on the part of the jury.
 
 
 11
 We find little merit in Phillips' fourth contention that there was an insufficient threshold showing of outrageous conduct. Under Colorado law in effect at the time of the trial, a "preponderance of evidence" standard was required for a finding of outrageous conduct. The more stringent "beyond a reasonable doubt" standard, adopted by the Colorado Supreme Court in Tri-Aspen Construction Co. v. Johnson, 714 P.2d 484 (Colo.1986) and followed by this court in Juarez v. United Farm Tools, Inc., 798 F.2d 1341 (10th Cir.1986), was not announced until well after the trial in this case had taken place. There was sufficient evidence that reasonable minds might differ on the outrageous conduct claim, especially under the "preponderance of evidence" standard. Thus we hold, without further discussion, that the district court did not err in submitting the outrageous conduct issue to the jury.
 
 I.
 
 12
 In support of its argument that it should not be held responsible for the actions of Desert Drilling Company personnel, Phillips points out that its contract with the drilling company explicitly refers to the latter as an "independent contractor." Phillips notes that Desert Drilling Company provided its own employees and equipment and contends that there was no showing that Phillips had any right of control over the manner in which the work was done.
 
 
 13
 The plaintiffs respond that the designation of a party as an "independent contractor" in an agreement does not resolve the issue of agency and that the existence of an agency relationship may be established by the intentions of the parties and by their conduct. The plaintiffs argue that there is ample evidence in the record to indicate that the employees of Desert Drilling Company did as they were told by Phillips.
 
 
 14
 While the contract between Desert Drilling Company and Phillips does suggest that in many respects Desert Drilling Company was an independent contractor, we held in Milligan v. Anderson, 522 F.2d 1202, 1207 (10th Cir.1975), that the terms "agents" and "independent contractor" are not necessarily mutually exclusive. In Appleby v. Kewanee Oil Co., 279 F.2d 334, 336 (10th Cir.1960), for example, we noted that "a broker is but a species of agent who may also be an independent contractor." The facts in this case indicate that the same may be said of Desert Drilling Company.
 
 
 15
 The record reveals that the employees of Desert Drilling Company drilled where they were told to by Phillips. On the day that Bradbury informed them that they were on the wrong property, the drillers told him to take it up with Cathy Suda, a Phillips employee. Suda's daily presence at the drilling site and her discussion with Bradbury concerning their location suggests that she had a supervisory role over the drillers. While it appears true that Suda and other Phillips geologists did not tell the drillers how to drill the hole, it was up to the geologists to tell the drillers where to drill, when to drill, and how to access the drilling locations. It was also up to Phillips to make arrangements with local landowners and to secure access and drilling rights. From these facts, the jury could reasonably conclude that Desert Drilling Company was an agent for Phillips during the time of the trespass on Panunzio's land.
 
 
 16
 Phillips also contends, however, that even if an agent-principal relationship did exist at the time of the trespass, the actions of Desert Drilling Company personnel in chasing Bradbury did not lie within the scope of their employment since it was not authorized and did not further the interests of Phillips. It is a familiar principle of law, Phillips observes, that "the torts of an independent contractor are generally the sole responsibility of that independent contractor, i.e., there is no vicarious liability on the part of the employer." Williams v. Burns, 463 F.Supp. 1278, 1284 (D.Colo.1979). Phillips notes, further, that a principal cannot be held responsible for the unauthorized intentional torts of its agent unless the principal ratifies the act and that there can be no ratification unless the principal adopts the agent's actions " 'with knowledge of all material facts....' " Nunnally v. Hilderman, 150 Colo. 363, 373 P.2d 940, 942 (1962) (citation omitted).
 
 
 17
 Since there were no special interrogatories regarding the agency issue, we have no way of knowing upon what basis the jury concluded that Phillips was liable for the actions of Desert Drilling Company personnel. However, the relationship of principal and agent is ordinarily a question of fact and a finding on the issue is binding on appeal if it is supported by substantial evidence or not clearly erroneous. Mitton v. Granite State Fire Insurance Co., 196 F.2d 988 (10th Cir.1952). With this standard in mind, we consider the record.
 
 
 18
 Though there was some dispute about Suda's actual statement, there was testimony that the jury might have reasonably believed that on the day of the assault, Suda gave Bradbury permission to take pictures and then failed to inform the drillers she had given her approval. It also appears that at one point the drillers hastily consulted Suda concerning Bradbury. According to Suda's testimony, one of the drillers looked at her as Bradbury was taking a picture of a license plate on a drilling company truck and asked, "Did you give him permission to do that?" When Suda shook her head, the chase was on.
 
 
 19
 Suda also stated that as Bradbury ran past her, with the drillers in pursuit, she had begun to gesture or holler at the drillers something like, "Forget it" or "Just let it go" though they did not notice. From these facts and consistent with the instructions they were given, the jury might have reasonably concluded that Suda was acting in a supervisory role at the time of the assault and battery of Bradbury and that she consented to the drillers' actions either expressly or by implication by raising no objection.
 
 
 20
 Because the jury might reasonably have found that Suda consented to the acts of Desert Drilling Company, reasonable grounds for ratification are not necessary. Such reasonable grounds exist, however. Suda testified that she watched as the drillers chased Bradbury up the road and saw Bradbury and two drillers cross the fence. Though she testified that she could not see the scuffle, Suda said she saw Bradbury return to the road a short time later where a friend of his in a vehicle picked him up. At the same time, the drillers returned with the camera. Taking Suda's testimony as true, which the jury was not obligated to do, it was an inescapable deduction from the events Suda said she witnessed that Bradbury did not part with his camera willingly. Under the circumstances, the jury might reasonably have concluded that Suda had knowledge of all material facts.
 
 
 21
 Further, when the drillers returned with the camera, Suda took it from them, put it in her truck and then instructed the drillers to cease drilling and wait there while she phoned the home office to determine what to do next. There is no indication that Phillips reprimanded or complained to Desert Drilling Company. In fact, Phillips continued to employ Desert Drilling Company after the incident. From this, consistent with their instructions, the jury might reasonably have concluded that Suda and Phillips ratified the actions of the drillers by word or conduct.
 
 
 22
 While it is a close call, there was sufficient evidence from which the jury could conclude that an agent-principal relationship existed between Desert Drilling Company and Phillips. Thus, we hold that it was not clearly erroneous for the jury to find that Phillips was liable for the plaintiffs' injuries.
 
 
 23
 This holding also disposes of Phillips' argument that there is no evidence in the record to justify the jury's award of punitive damages. As noted, there is sufficient evidence to support a conclusion that Phillips authorized or approved the actions of Desert Drilling Company employees. Such evidence is likewise sufficient to support an award of punitive damages. See, Malandris v. Merrill Lynch, Pierce, Fenner & Smith, 703 F.2d 1152, 1173-74 (10th Cir.1981), cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); Holland Furnace Co. v. Robson, 157 Colo. 347, 402 P.2d 628, 631 (Colo.1965), Restatement (Second) of Agency, Sec. 217C (1957).II.
 
 
 24
 The altercation between Desert Drilling Company personnel and Bradbury in August, 1980, was not the first time landowners in the Placerville area had found reason to complain about the uranium exploration project. Before considering Phillips' objection to the admission of evidence of prior settlements or compromises between Phillips and other landowners, it will be helpful to review those incidents.
 
 
 25
 In June, 1979, Fern Foster complained that Phillips personnel had trespassed on her property and changed the lock on her gate without giving her a key. There had apparently been a mix-up between Foster and a Phillips geologist, George Vance, concerning access rights and whether or not Foster or her lessee, a Mrs. Brown, was entitled to the key to the locked gate. In the same month, Phillips paid compensation to Phillip Gibbs for surface damage to his pasture and to roads and repaired his damaged spring.
 
 
 26
 Then in July, 1979, Phillips paid for damages caused when a bulldozer operator employed by Phillips damaged a fence belonging to Louis Burkey. Following this incident, a Phillips supervisor, Robert Enz, wrote an intercompany memo indicating that a "touchy situation" existed between Phillips and the landowners in the Placerville area which would require "patience, concern, understanding and tremendous amounts of Public Relations."
 
 
 27
 In July, 1980, landowner A.M. Crews claimed that under the direction of Suda, Desert Drilling Company personnel had cut across his property to access other properties held by Phillips. Crews also complained that the drilling personnel had not yet plugged a hole they had drilled on his land the previous year.
 
 
 28
 In August, 1980, Arthur Strauss' neighbor saw a truck apparently belonging to Desert Drilling Company back into Mr. Strauss' gatepost damaging the gate and allowing two of his horses to escape. At the insistence of Phillips, which threatened to drop Desert Drilling Company from their list of eligible contractors, Desert Drilling Company paid Strauss' claim.
 
 
 29
 Also in August, 1980, Suda directed the excavation of a road to gain access to a drilling site. Due to surveying mistakes by Meuer, Serafini and Meuer, workers bulldozed a road across the property of David Greevers who had not given Phillips permission to cross his land, much less build a road. Phillips paid for the damages, admitting that it could not proceed against the surveying company since Phillips personnel were supposed to check the work of the surveyors but apparently did not discover the mistake. This incident occurred five days before the assault on Bradbury.
 
 
 30
 Finally, in September, 1980, a crew from Desert Drilling Company, apparently under the direction of Suda, veered off an existing road on William Jutten's property and drove for three-quarters mile over his meadow to the drill site. Jutten protested that this was unnecessary since the road ran so close to the drill site. In addition, the drill crew left a gate open and eighty-two head of cattle wandered off Mr. Jutten's property. It took four ranch hands and several horses two days to round up the errant cattle. The cost of the round up and reseeding the damaged land was paid by Phillips.
 
 
 31
 Phillips filed a motion in limine to exclude references to or exhibits concerning the above incidents. The district court denied the motion. Evidence relating to these incidents, in the form of correspondence and claims reports, was admitted as exhibits. These incidents were also explored at various times through the examination of witnesses at trial. Phillips argues that this evidence should have been excluded under Rule 408 and Rule 404 of the Fed.R.Evid. and that the district court committed reversible error by admitting it.
 
 Rule 408
 
 32
 Phillips' first basis for objection is that Rule 408 of the Fed.R.Evid. forbids the admission of evidence from compromises or compromise negotiations "to prove liability for or invalidity of the claim or its amount." Phillips points out that the purpose of the rule, according to the Advisory Committee's notes, is to foster honest attempts to settle controverted claims without resorting to expensive and time consuming litigation. Phillips urges that parties will have little incentive to settle claims amicably if evidence from compromises and compromise negotiations will come back to haunt them in subsequent litigation.
 
 
 33
 In determining whether or not the disputed evidence should have been excluded under Rule 408, we must first determine whether the rule applies under the circumstances of this case. Rule 408 is limited in its application to evidence concerning the settlement or compromise of "a claim" when such evidence is offered to prove liability or validity of "the claim" (emphasis added) or its amount. Read literally, the rule does not appear to cover compromises and compromise offers that do not involve the dispute that is the subject of the suit, even if one of the parties to the suit was also a party to the compromise.
 
 
 34
 Phillips argues, however, that Rule 408 should not be limited to compromise evidence concerning only the claim that is being litigated. It contends that the policy concerns behind Rule 408, such as encouraging out-of-court settlement, are implicated even where, as here, the compromise evidence concerns different claims. Phillips points out that in Scaramuzzo v. Glenmore Distilleries, Co., 501 F.Supp. 727 (N.D.Ill.1980) the court excluded evidence that the employer had settled age discrimination complaints that had been filed by persons other than the plaintiff. The court in Scaramuzzo noted that Rule 408 did not directly apply but concluded that a settlement offer is of no legal relevance as to the offeror's liability "irrespective of whether the offer was made in the instant case or in a related case." Id. at 733.
 
 
 35
 The facts in Scaramuzzo are sketchy and the nature of the proffered settlement evidence is not explained. It is clear from the court's discussion of the matter, however, that the settlements concerned "related cases." Id. The Scaramuzzo court relied on 2 J. Weinstein, Weinstein's Evidence, Sec. 408 at 408-27 (1986), wherein it is stated that Rule 408 excludes "attempted use of a completed compromise of a claim arising out of the same transaction between a third person and a party to the suit being litigated." (Emphasis added.)
 
 
 36
 In this case the settlement of the seven prior claims brought by landowners arguably involved claims that arose out of different events and transactions. Yet the stronger argument is that these claims are related inasmuch as they arose in the course of the same large scale uranium exploration project operated by Phillips, and because they are similar enough to the claim sued upon in this case to be relevant. These factors, combined with the strong policy interest in encouraging the settlement of disputes without resort to litigation, is sufficient to bring the evidence concerning the seven compromises and settlements under the umbrella of Rule 408.
 
 
 37
 Having determined that Rule 408 applies under the circumstances of this case, we must determine whether it requires exclusion of the disputed evidence. The plaintiffs point out that Rule 408 does not exclude compromise evidence in all situations, but only where the evidence is offered to prove "liability for or invalidity of the claim or its amount." The rule does not require exclusion when the evidence is offered "for another purpose...." The plaintiffs note, for example, that in Wegerer v. First Commodity Corporation of Boston, 744 F.2d 719 (10th Cir.1984), evidence of prior settlements was admitted to show the defendant's intent to commit fraud and to support the issue of punitive damages. The plaintiffs argue that they offered the evidence of previous settlements in this case to demonstrate Phillips' continuous course of reckless conduct and disregard of personal and property rights, to negate the defense of mistake, to show the relationship and extent of control between Phillips and Desert Drilling Company, to prove that Phillips had noticed and was aware of Desert Drilling Company personnel's conduct, and to rebut Phillips assertion that the conduct was unintentional. For these purposes, the plaintiffs contend, the evidence was admissible.
 
 
 38
 In our view, when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers. However, we believe that the "other purposes" described by the plaintiffs appear to represent exceptions to Rule 408. Because the same issue arises in connection with Rule 404 as well, we will analyze the validity of these "other purposes" in connection with Phillips' next argument.
 
 Rule 404
 
 39
 Phillips also contends that it was improper to admit the evidence under Rule 404 of the Fed.R.Evid. which forbids admission of evidence of other crimes, wrongs or acts to prove the character of a person in order to show that he acted in conformity therewith.
 
 
 40
 Just as Rule 408 does not completely bar the admission of compromise evidence, Rule 404 does not completely bar character evidence. Rather, Rule 404 excludes evidence of other wrongs or acts to prove the character of a person in order to show that he acted in conformity therewith, but allows the admission of prior acts for other purposes. For example, in a list that is illustrative rather than exhaustive, the rule states that evidence of other wrongs or acts may be admitted to show motive, intent, knowledge, or the "absence of mistake or accident." Thus, as with Rule 408, we must first determine whether the proffered evidence serves a valid "other purpose."
 
 
 41
 Since the plaintiffs' allege that the actions of the Desert Drilling Company personnel amounted to extreme and outrageous conduct and Phillips responds by characterizing the conduct as accidental, the issue of mistake or accident is important in this case. Along the same lines, the court instructed the jury that one element of outrageous conduct is recklessness. The evidence that seven landowners, in addition to Bradbury and Panunzio, complained to Phillips of trespass and property damage during two summers is probative on the issue of whether the incident was simply a mistake or accident and whether or not Phillips' conduct was reckless.
 
 
 42
 The district court also instructed the jury that a "series of acts may constitute outrageous conduct even though any one of the acts might be considered only an isolated unkindness or insult...." Thus, evidence that the project created problems for local land owners on seven other occasions is probative on the issue of whether the incident involving Bradbury and Panunzio was simply an isolated mistake or, rather, part of a series of incidents that might illustrate outrageous conduct on the part of Phillips towards the rights and feelings of landowners. In an analogous situation, the court in Dosier v. Miami Valley Broadcasting Corporation, 656 F.2d 1295, 1300 (9th Cir.1981), admitted evidence of past incidents of discrimination by the employer, though claims arising out of those incidents had been settled, to establish "a continuing pattern of discrimination...."
 
 
 43
 These uses, we believe, were contemplated by the district court when it ordered the admission of the evidence for the purpose of showing that Phillips "engaged in a pattern of conduct evincing conscious or reckless disregard for the rights of private property owners" and "to support the plaintiffs' claims for outrageous conduct and for punitive damages." For these purposes, the evidence legitimately fell under the "other purposes" exceptions for both Rule 408 and Rule 404.
 
 
 44
 Phillips also contends, however, that the evidence lacks relevancy because the incidents are not similar to the incident between Bradbury and the Desert Drilling Company personnel. Phillips points out that in Julander v. Ford Motor Co., 488 F.2d 839, 847 (10th Cir.1973), we held that evidence of other acts must "bear similarity to the circumstances surrounding the accident which is the subject of the matter on trial."
 
 
 45
 It is true that none of the incidents with other landowners involved personal injury, most appeared to be accidents, and Phillips had a lease arrangement with most of the other landowners who brought complaints. Yet the similarities are as striking as the differences. All seven of the incidents involved trespass or destruction of property, four of them involved either Suda, personnel from Desert Drilling Company, or both. Furthermore, all of the incidents occurred in the same area and all occurred in the course of two summers. The fact that the incidents did not involve personal injuries in no way detracts from the relevance of the incidents in regard to the trespass and outrageous conduct claims.
 
 
 46
 The question of similarity necessarily depends upon the nature of the case and the purpose for which the evidence is offered. The Julander case, for example, involved a products liability suit in which this court excluded copies of other complaints against Ford Motor Company alleging "steering problems of one sort or another" that were "understandably couched in general language" such that it was difficult to determine the precise nature of the problem encountered in the complaints. Julander, 488 F.2d at 839. Yet in this case we are not dealing with the failure of a mechanical part or design but rather with a pattern of human conduct. For this purpose, there is sufficient similarity to satisfy the requirement of Julander.
 
 
 47
 Finally, Phillips raises a heartfelt objection that the evidence of compromises and prior incidents involving other landowners lacks probative value and is highly prejudicial under Rule 403 of the Fed.R.Evid. Phillips points out that evidence of compromises is not probative on the issues involved in the compromise because there may be many reasons that a party would choose to settle rather than to dispute a claim. Indeed, the exhibits in this case reveal Phillips' concern with maintaining good relations with the local landowners. Phillips further notes that evidence of prior acts is particularly susceptible to the danger of undue prejudice and confusion of the issues. The high punitive damage awards in this case, Phillips argues, demonstrates a general feeling by the jury that Phillips deserved to be punished not just for its conduct towards the plaintiffs but for its treatment of other landowners as well. Phillips correctly points out that the plaintiffs in this case are not entitled to compensation for alleged mistreatment of other property owners. See Brenimer v. Great Western Sugar Co., 567 F.Supp. 218 (D.Colo.1983).
 
 
 48
 Phillips' arguments concerning the prejudicial effect of the disputed evidence are well taken. In the admission of prior acts, and likewise in the admission of compromise evidence, there is always the risk that the jury "will either draw the forbidden and deadly three-step inference from bad act to bad person to guilt or give way to an unthinkable and emotional impulse to punish." 2 D. Louisell and C. Mueller, Federal Evidence, Sec. 140 at 176 (rev. ed. 1985). The proper approach is not simply to find a "pigeon hole" in which the proof might fit, but to determine whether the evidence proves something other than propensity and then to weigh the particular relevancy against the risk of prejudice. Id.
 
 
 49
 In considering this issue, however, we are mindful of the fact that the admission of evidence is largely a matter of the district court's discretion. In the absence of manifest error, we will not reverse the district court's decision to admit evidence. Big O Tire Dealers v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1372 (10th Cir.1977), cert. dismissed, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978) In this case, the district court's ruling to admit the evidence has the earmarks of a carefully considered decision. The issue was briefed and decided in limine before trial. Each piece of evidence was identified and reviewed. There is an on-the-record designation of the purposes for which the evidence is admissible. The one precaution that is missing is an instruction advising the jury of the limited value of the compromise and prior acts evidence and its proper application. It was Phillips' duty, however, to request such an instruction if it so desired. The record does not indicate such a request.
 
 
 50
 As noted above, evidence concerning the seven other incidents involving Placerville area landowners has probative value on specific elements of the claims and defenses in this case. Further, Phillips had the opportunity to explore these incidents at trial through examination of its own witnesses and did so. Phillips was able to point out any dissimilarities for the jury and to argue any mitigating circumstances. The exhibits themselves, consisting of the contents of claims files with numerous letters and memos from Phillips personnel, do not contain inflammatory or scandalous material and generally present the incidents in light favorable to Phillips. Thus, we hold that the district court did not abuse its discretion in concluding that the probative value of the evidence outweighed the risk of prejudice. The admission of the evidence did not amount to manifest error.
 
 III.
 
 51
 The last issue in this appeal concerns damages. Phillips notes that there is a ratio of one to fifty thousand between the $1 the jury awarded Bradbury in actual damages for outrageous conduct and the $50,000 awarded him in exemplary damages. Similarly, there is a ratio of one to fifty between the $500 the jury awarded Bradbury in actual damages for the assault and battery and the $25,000 awarded him in exemplary damages on the same claim. Phillips points out that because it accidentally drilled a hole five inches in diameter and five hundred feet deep on Panunzio's land, the jury awarded Panunzio $86,000.
 
 
 52
 Citing Frick v. Abell, 198 Colo. 508, 602 P.2d 852 (1979), Phillips argues that under Colorado law, an award of exemplary damages must bear a reasonable relationship and be in reasonable proportion to the actual damages suffered by the complaining party. Phillips urges that in view of the minimum actual damages suffered by the plaintiffs, the vastly disproportionate nature of the exemplary damage awards should shock the judicial conscience.
 
 
 53
 The plaintiffs respond that Colorado no longer considers ratio in determining the excessiveness of a punitive damage award. Coale v. Dow Chemical Co., 701 P.2d 885 (Colo.App.1985). In Frick, 602 P.2d at 854, the Colorado Supreme Court declared that while there was no precise formula, the reasonableness of an award should be ascertained "by examining the facts of the case to discover if the jury was impermissibly motivated by prejudice or properly guided by the purposes for exemplary damages."
 
 
 54
 The district court explained the proper purposes of exemplary damages to the jury when it instructed at the close of argument that the jury should be guided by the economic status of the defendant, the nature of the act causing injury, and the deterrent effect of a punitive damage award on others. See Palmer v. A.H. Robins, 684 P.2d 187 (Colo.1984). Given the evidence that Phillips' economic worth is roughly $6.2 billion, the acts causing injury in this case were trespass, outrageous conduct, and assault and battery, and given the aim of discouraging such activities, we cannot say that the jury was not properly guided by the purposes of exemplary damages. In view of these considerations, the award does not appear shocking.
 
 
 55
 We may, as the defendants suggest, hypothesize that the jury was motivated to punish Phillips for the seven prior acts that Phillips settled with other land owners. At the same time, however, we can hypothesize that the jury was motivated to punish Phillips for drilling, perhaps with reckless or deliberate disregard for the rights of Panunzio, on land it had been denied access to, and for authorizing or ratifying the assault and battery of Bradbury. A verdict may be set aside if it is so excessive as to plainly suggest that it was the product of passion, bias, or prejudice. Wells v. Colorado College, 478 F.2d 158, 162 (10th Cir.1973). Under the circumstances of this case, we cannot hold that the jury's award was so plainly excessive as to merit reduction or reversal.
 
 
 56
 AFFIRMED.