905 F.2d 1533
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
WINCHESTER COALS, INC.; Mullins Coal Company, Petitioners,
v.
FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION; Wilfred
Bryant, Respondents.
Wilfred BRYANT, Petitioner,
v.
FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION, Respondent.
 Nos. 89-3247, 89-3352.
 United States Court of Appeals, Fourth Circuit.
 Argued April 6, 1990.
Decided May 10, 1990.
 
 Michael L. Keller, Goodwin & Goodwin, Charleston, West Va. (argued), for petitioners; Robert Q. Sayre, Jr., Goodwin & Goodwin, Charleston, W. Va., on brief.
 Barbara Evans Fleischauer, Morgantown, W.Va. (argued), for respondents; Paul R. Sheridan, Logan, W. Va., J. Joseph Ferrara, Washington, D.C., on brief.
 FMSHRC
 AFFIRMED.
 Before ERVIN, Chief Judge, and K.K. HALL and CHAPMAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Winchester Coals, Inc. ("Winchester"), and Mullins Coal Company ("Mullins") seek judicial review of a decision of the Federal Mine Safety and Health Review Commission (the "Commission"), contending that the Commission erred in holding them vicariously responsible for the termination of Wilfred Bryant ("Bryant") by Dingess Mine Service, Inc. ("Dingess"), in contravention of the Federal Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Secs. 801 et seq. (the "Act"). In its final decision, the Commission concluded that Dingess was a supervisory agent of both Winchester and Mullins, and that Winchester and Mullins therefore were liable for all damages and attorneys' fees awarded to Bryant on his retaliatory discharge claim. In their petition for review, Winchester and Mullins argue that Dingess was not their agent, that they were not vicariously culpable for Bryant's dismissal, and that the award of attorneys' fees to Bryant was excessive. Bryant cross-petitions for review of the Commission's determination that, as a consequence of his own refusal to resume work when offered by Dingess, he was entitled to compensation for only nine regular days of work. Because the Commission's findings are supported by substantial evidence on the record considered as a whole, its decision is hereby affirmed in all respects.
 
 I.
 
 2
 Winchester and Mullins are wholly-owned subsidiaries of the same parent corporation, Imperial Pacific Investments, and a single individual, Donald Cooper, is President of both companies. Mullins is the lessee of certain unmined coal located in Logan County, West Virginia, and the owner of what is referred to by the parties as "Mullins No. 2 Mine" (the "Mine"). On July 20, 1982, Mullins entered into a mining agreement with Dingess, pursuant to which Dingess undertook to operate the Mine for Mullins. Dingess was a partnership established by two brothers, Joseph and John Dingess, for the primary purpose of operating the Mine. It should be noted that neither brother had ever operated a mine before this occasion. About this same time, Dingess also signed an agreement with Winchester, whereby Dingess leased from Winchester the special mining equipment it needed to operate the Mine (hereinafter both agreements will be referred to as the "Contracts"). Both Mullins and Winchester were represented at the Mine by Roger Cook ("Cook").
 
 
 3
 On April 23, 1984, Dingess hired Bryant as a shuttle car operator at the Mine. According to Bryant and others, the shuttle car to which he had been assigned had a broken transmission, no lights, and defective brakes and steering. Apparently, the only means of stopping the vehicle once it had been started was to shift it into reverse or neutral, or to ram it into another object, such as a coal loading machine. After driving the shuttle car for three days, Bryant complained to his foreman and section foreman that the vehicle did not function properly, and that it was unsafe to drive. They merely told him to "do the best you can do." Bryant also had reported the dangerous condition of the shuttle car, especially the inoperative brakes, to his section boss and section mechanic. They both refused to take any corrective actions. The next day, Bryant told his superiors that he no longer wished to operate the shuttle car, and his supervisors assigned him to alternative work. On the following morning, April 27, 1984, a foreman telephoned Bryant at home to tell him that he had been "laid off" due to flooding at the Mine. Bryant thereafter discovered that no flooding had occurred, and that the story was simply a pretext for his termination.
 
 
 4
 Shortly after he was fired, Bryant filed a grievance with Dingess through his union representative. Five days later, Dingess offered to settle Bryant's grievance by placing him on a "recall panel." Dingess promised to call Bryant back to work within "a couple of days at the most." On May 9, 1984, Bryant refused this offer because he believed that it had not been made in good faith and, furthermore, that Dingess had no intention of repairing the shuttle car.
 
 
 5
 On May 1, 1984, Bryant filed a complaint with the Federal Mine Safety and Health Administration (the "Agency"), alleging that his dismissal constituted retaliatory discharge in violation of 30 U.S.C. Sec. 815(c). After reviewing Bryant's complaint, the Agency concluded that no violation of the Act had occurred. Bryant then filed a complaint with the Commission on November 26, 1984.[1] The matter was referred to an administrative law judge ("ALJ"), who conducted a formal hearing on the merits of Bryant's complaint on November 12-13, 1986. Thereafter, on February 24, 1987, the ALJ issued a decision finding that Dingess had violated Section 815(c) by discharging Bryant because of his safety complaints and his refusal to operate the defective shuttle car, which are protected activities under the Act. The ALJ also determined that Bryant had refused a valid job offer on May 9, 1984, that Dingess' unlawful actions therefore had ceased on that date, that Bryant was entitled to back pay for the period of April 27, 1984, through May 9, 1984,[2] and that Winchester and Mullins were not liable for the adverse employment action taken against Bryant because they had taken no direct action which constituted a violation of the Act.
 
 
 6
 After reviewing the ALJ's decision, the Commission: (1) affirmed the ALJ's limited back pay award; (2) reversed the ALJ's finding that Winchester and Mullins were not liable for Bryant's dismissal, concluding that Dingess was their "supervisory agent" and that they were vicariously responsible for Dingess' statutory violation; and (3) remanded the case to the ALJ for a recalculation of the attorneys' fees awarded to Bryant in light of the additional success achieved by him. On remand, the ALJ increased his previous award of attorneys' fees from $10,662 to $23,317. The parties now seek judicial review of the ALJ's original decision with respect to the back pay period, the Commission's decision with regard to its reliance on an agency theory of liability, and the ALJ's decision on remand awarding costs and attorneys' fees. This court has jurisdiction to review final orders of the Commission pursuant to 30 U.S.C. Sec. 816(a)(1).
 
 II.
 
 7
 We first address the question of agency. The inquiry of whether an agency relationship exists is ordinarily a question of fact. See Board of Trade of Chicago v. Hammond Elevator Co., 198 U.S. 424, 437-38 (1904); Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1361 (10th Cir.1987); Equilease Corp. v. M/V Sampson, 756 F.2d 357, 363 (5th Cir.1985), on reh'g, 793 F.2d 598 (5th Cir.), cert. denied, 479 U.S. 984 (1986). "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C. Sec. 816(a)(1). An examination of the record below reveals that there is substantial evidence to support the Commission's finding that Dingess was an agent of Winchester and Mullins.
 
 
 8
 For example, the record indicates that: (1) Dingess and the Dingess brothers lacked the technical expertise to operate the Mine independently and without the continuing assistance of Winchester and Mullins; (2) Cook, who represented both Mullins and Winchester at the Mine, regularly oversaw coal production and Mine operations, inspected the Mine shafts and equipment, was involved in troubleshooting problems at the Mine, and scrutinized Dingess' compliance with governmental regulations, contractual requirements, and labor responsibilities; (3) Cook directed Winchester employees to fix problems at the Mine which Dingess failed to correct despite his insistence; (4) Winchester and Mullins handled many of Dingess' financial transactions with third parties, often reimbursing and paying Dingess' suppliers, and trucking and repair companies; (5) Winchester made at least one large cash payment to Dingess' Mine foreman; (6) Cook frequently urged Dingess to increase coal production, and was instrumental in having Dingess develop a second mining section at the Mine to achieve that goal; and (7) Winchester and Mullins retained an engineering firm to design the additional mining section. In effect, Dingess was the Mine "operator" in name only. Indeed, Winchester and Mullins provided all of the essential elements for a successful mining operation--the financing, the planning, the equipment and the expertise. Thus, the Commission's decision can be sustained on the record.
 
 
 9
 As an alternative ground for an affirmance, Bryant argues that even if this court concludes that Dingess was an independent contractor and not a supervisory agent of Winchester and Mullins, Winchester and Mullins are still liable for Dingess' violation in light of this court's decision in Bituminous Coal Operators' Assn., Inc. v. Secretary of Interior, 547 F.2d 240 (4th Cir.1977). In that case, a panel of this court held that the owner of a mine is fully liable for all health, safety and other specified violations of the Act, regardless of who committed the violations. Id. at 246-47. The court wrote: "In sum, we conclude that the Act does not prohibit the Secretary [of the Interior] from holding a mining company [the owner] and a construction company [the builder of the mine] jointly or severally liable for violations committed by the construction company." Id. at 247. Because the Commission's decision can be affirmed on the evidence contained in the record, we decline to extend the liability of a mine owner under the Act to embrace, as a matter of law, all discriminatory or retaliatory employment actions taken by a mine operator.
 
 III.
 
 10
 We next consider the issue of the backpay period and the quantum of damages. The ALJ found, and the Commission concurred, that Dingess had tendered a bona fide and unconditional offer to reinstate Bryant in settlement of his union-filed grievance, and that Bryant's rejection of the offer amounted to a resignation. Bryant contends that Dingess' refusal to repair the shuttle car was an unreasonable condition of reemployment which he should not have been required to accept. Thus, since Dingess' offer to rehire Bryant was conditional rather than absolute, it failed to satisfy the requirement enunciated by the Supreme Court in Ford Motor Co. v. EEOC, 458 U.S. 219, 238-39 (1982), that reinstatement offers be unconditional. Bryant also insists that Dingess failed to make a bona fide reemployment offer because he received only an unenforceable oral offer and not a written promise.
 
 
 11
 This case illustrates why Congress has provided a narrow standard of judicial review in cases brought under the Act. There is little doubt that Bryant raises some valid concerns. However, he presented these same arguments to the ALJ and the Commission, and they were weighed against the arguments made by Winchester and Mullins. Although there is not much evidence in the record on this issue, we cannot say with certainty that the decisions of the ALJ and the Commission are unsupported by substantial evidence, and nothing in Bryant's brief or his arguments before this court persuades us to conclude otherwise. In other words, there is no evidence in the record that Dingess was insincere in offering to rehire Bryant, or that, had Bryant returned to work at the Mine, he would have been subjected to hazardous or dangerous working conditions.
 
 IV.
 
 12
 Finally, we turn to the question of attorneys' fees. In United Food & Commercial Workers, Local 400 v. Marval Poultry Co., Inc., 876 F.2d 346, 351 (4th Cir.1989), this court set forth the variable standard of review for evaluating the award or denial of attorneys' fees:
 
 
 13
 While the ultimate decision to award or deny attorney fees typically has at least a large discretionary component, it may be revealed upon inspection that such a decision actually turned on an express or implicit finding of fact or conclusion of law that dictated the ultimate result. In the more typical case, the ultimate decision will be an amalgam--an exercise of discretion based upon explicit or implicit findings of fact and conclusions of law about the availability and scope of discretion. Review may correspondingly be an amalgam, depending upon the claims of error. If the claim is of error in underlying fact-findings which infected the ultimate decision, review must proceed under the clearly erroneous standard; if of error of law infecting the ultimate decision, under de novo review standard. Only if the claim of error goes exclusively to the impropriety of an ultimate exercise of available discretion is review solely under the abuse of discretion standard.
 
 
 14
 In this case, the court must decide whether the $23,317 awarded by the ALJ to Bryant for attorneys' fees is excessive in light of the limited monetary recovery of $1,297.48 in compensatory damages, and the invaluable vindication of rights protected under the Act. We believe that this question is governed by an abuse of discretion standard of review as there are no plain questions of fact or law to be resolved. After examining the record in this case, we can find no indication that the ALJ abused his discretion with respect to the award of attorneys' fees. While the amount of damages recovered by Bryant was small, we recognize that important health and safety rights were vindicated in the course of this litigation.
 
 V.
 
 15
 Based on the foregoing reasons, the decision of the Commission is hereby
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 The parties named in Bryant's complaint included Winchester, Mullins, Dingess, and Joseph and John Dingess. Dingess and the Dingess brothers never filed an answer to Bryant's complaint, did not attend the administrative hearing, and declined to participate in this case. As a result, the ALJ entered a default judgment against them. The parties have noted, however, that Dingess is no longer a going concern, and that the Dingess Brothers, who are currently residing in Florida, are judgment proof
 
 
 [2]
 This period comprised nine working days, entitling Bryant to damages amounting to $1,297.48 plus post-judgment interest