David L. HADERLIE and J.P. Robinson, d/b/a Jack Knife Ranch and Construction, Appellants (Defendants),

v.

James A. SONDGEROTH, Appellee (Plaintiff).

No. 91–114.

Supreme Court of Wyoming.

Dec. 15, 1993.

R. Michael Mullikin (argued) of Mullikin, Larson & Swift, Jackson, for appellants.

Gerald R. Mason (argued) of Mason & Graham, and William H. Twichell (argued), Pinedale, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

CARDINE, Justice.

This was a suit by appellee James Sondgeroth to recover personal injury damages resulting from his automobile striking a horse that had earlier been struck and killed by appellant Haderlie near Bondurant, Wyoming. Two defendants, the owner of the horse and owner of the land where the horse was pastured, had settled prior to trial and were dismissed from the case. Each was on the verdict form and found to be 0 percent at fault. This appeal is from a judgment on the $375,000 jury verdict without credit for the sums paid by the defendants who settled before trial.

We affirm.

Appellants raised the following issues which were presented to the court in the first oral argument:

1. Whether the trial court erred in instructing the jury that David L. Haderlie had a legal duty to take reasonable steps to warn appellee and other motorists, or guard against the danger, of the horse obstructing the highway and in refusing appellants proposed Instructions Nos. 7 and 9.

2. Whether the trial court erred in refusing to admit into evidence the prior pleadings and settlement agreements of appellee which admitted the fault of co-defendants Sleeping Indian Outfitters, Inc. and Paul Anselmi, which co-defendants had settled with appellee, as judicial admissions

under Rule 801, W.R.E., and on the issue of damages.

3. Whether the trial court erred in refusing to permit the attorney for appellants to cross-examine the plaintiff with his prior pleadings and with the settlement agreements between appellants and co-defendants, Sleeping Indian Outfitters, Inc. and Paul Anselmi.

4. Whether the trial court erred in refusing to permit the attorney for appellants to advise the jury of the fact of the settlements and the terms thereof, which appellee had made with the former co-defendants, Sleeping Indian Outfitters, Inc. and Paul Anselmi, on the basis of Wyo.Stat. § 1–1–109(b)(i)(B) (1977), which requires the court, when requested, to inform the jury of the consequences of its verdict.

5. Whether the trial court erred in entering judgment for the full amount of the jury verdict without crediting appellants for the aggregate amount received by appellee from the settling co-defendants.

6. Whether the trial court erred in refusing to give the *"sudden emergency"* instruction proffered by appellants.

7. Whether the verdict of the jury finding appellants one hundred percent (100%) at fault is supported by the evidence. [emphasis in original]

After argument, conference and discussion among the justices, it became apparent that the most significant and critical issue presented was whether the amounts paid appellee by the settling defendants should be credited upon the judgment against appellants Haderlie, *et al.* Therefore, on February 11, 1993, we ordered additional briefing and argument requiring that

> each of the parties shall submit a brief addressing the applicability, if any, of the following: Wyo.Stat. § 1–1–108 (1988); *Rambaum v. Swisher,* 435 N.W.2d 19 (Minn.1989); and, such other additional authorities as the parties may choose to present. Each party may submit a brief in reply 15 days thereafter. And it is,

FURTHER ORDERED that this matter shall then be set for argument before the Court at its earliest convenience.

Order Directing Additional Briefing and Argument (Feb. 11, 1993).

## Facts

On the evening of October 29, 1987, appellant David Haderlie was driving a truck northbound on U.S. 191 near Bondurant, Wyoming. Appellant came upon a dark-colored horse in his lane of traffic. Before he could take evasive action, appellant struck and killed the horse. When appellant struck the horse, the hood of his vehicle flew up. He pulled to the side of the road and discovered that his truck was inoperable. Appellant shut the hood of his truck, turned on his flasher lights, walked to the horse, and discovered that it was dead. He began to walk toward some lights for help when he came upon another pickup truck coming down a side road towards the highway. He informed the group in that truck that he had hit a horse. Appellant and the group then drove to the highway to move the horse from the center of the road.

The group parked on the side of the road, and, while there, another vehicle was approaching where the horse lay. Appellant testified at trial that someone turned the flashers on in the group's pickup and flashed the headlights to warn the approaching vehicle. This testimony, however, was impeached on cross-examination and not corroborated by others in the group. The highway patrol officer testified that one minute and thirty seconds had passed between the time that appellant and the group in the truck had seen the vehicle approaching before it hit the horse.

Appellee James Sondgeroth was driving the approaching vehicle. He noticed a truck pulled over with just the yellow running lights on. Appellee testified that there were no flashing or blinking lights. Appellee passed the pickup, his vehicle struck the dead horse in the road, and he became "airborne."

Appellee suffered severe injuries in the accident consisting of cervical spine fractures, a dislocation of vertebral bodies with nerve injury, and a severe concussion. Appellee brought suit against: appellant, the driver of the first vehicle; appellant's em-

ployer, J.P. Robinson, d/b/a Jack Knife Ranch and Construction (appellants); and Sleeping Indian Outfitters, the owner of the horse. Appellee later amended his complaint to join Paul Anselmi, the owner of the property where Sleeping Indian Outfitters pastured this horse. Sleeping Indian Outfitters and Paul Anselmi settled with appellee before trial and were dismissed from the suit.

Appellee proceeded to trial against appellants. After hearing the evidence, the jury returned its verdict finding fault as follows: appellee 0 percent, appellants David Haderlie and J.P. Robinson d/b/a Jack Knife Ranch and Construction (Haderlie) 100 percent, Paul Anselmi 0 percent, and Sleeping Indian Outfitters 0 percent. The jury found that $375,000 was the amount of damages sustained by appellee and that appellants were liable for 100 percent of the damage.

Appellants challenge the judgment below on several grounds. Their initial primary focus on appeal was directed to whether or not appellants should have been allowed to introduce evidence of the settlements with other defendants that occurred prior to trial. Upon rebriefing and reargument, the primary focus of the appeal has shifted to the issue of credit upon the judgment for payments made by the settling defendants. The parties in their additional briefs filed pursuant to the court's order agreed that the issue presented was clearly stated in issue five above as:

Whether the trial court erred in entering judgment for the full amount of the jury verdict without crediting appellants for the aggregate amount received by appellee from the settling co-defendants.

This is the issue we discuss first.

### Entry of Judgment without Settlement Credit

Appellants argue that the trial court erred in entering judgment for the amount of the verdict without first deducting the amount appellee received from Paul Anselmi and Sleeping Indian, the settling defendants.

In this case, prior to trial, appellee settled for the sums shown and dismissed his case against:

| | | |
|---|---|---|
| (a) | Sleeping Indian Outfitter (horse owner) | $195,000 |
| (b) | Paul Anselmi (pasture owner) | 10,000 |
| | Total agreed upon settlement | $205,000 |

Thereafter, the case was tried to a jury against appellant David Haderlie and his employer, the only defendants remaining, with the settling participants listed on the verdict form. The jury returned the following verdict:

| | | |
|---|---|---|
| (a) | Sleeping Indian percentage of fault | 0% |
| (b) | Paul Anselmi percentage of fault | 0% |
| (c) | David Haderlie and J.P. Robinson, dba Jack Knife Ranch and Construction percentage of fault | 100% |
| | Total damages suffered by Sondgeroth | $375,000 [1] |

Thus the jury found that the settling defendants owed appellee nothing since they were 0 percent at fault. The settling defendants, in hindsight, paid more than this jury found they owed. Aside from the law (which is clear), the policy question presented is who should receive the benefit of the $205,000 paid by the settling parties. Should it be:

(a) Returned to Anselmi and Sleeping Indian? The parties' settlement agreement does not provide this result.

(b) Should that defendant, who took his chances on trial and who was found 100 percent at fault, receive a $205,000 credit? If he does, he will only pay 45 percent of the judgment rather than the 100 percent found due. If this is the result, tortfeasors will hold off settling to get credit for the payment of others. There will be little incentive to settle.

(c) Should it go to the injured plaintiff? He gambled that the settlement would be right—if it is less, he loses—if it is more, he gains.

---

1. Parenthetically, I must add that I am not convinced $375,000 was appellee's total damages. It was just the amount this jury would award against this lone defendant. Had there been three defendants against whom the jury could award damages, I am convinced the total verdict would be greater—and most experienced trial counsel will agree this is true.

Prior to 1986, joint tortfeasors were jointly and severally liable for damages payable to an injured party. Thus, all parties liable were jointly obligated for the total damage and each party was individually obligated to pay the total damage. An injured party, not at fault, could recover his entire judgment (100 percent) from a five percent negligent party. With joint and several liability, there was the right of contribution among tortfeasors found in W.S. 1–1–110(b) (1977), which provided:

(b) The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is compelled to make contribution beyond his own pro rata share of the entire liability.

The five percent negligent party, having paid 100 percent of the judgment, then had a right of contribution under W.S. 1–1–110(b) and could recover from the 95 percent negligent party the 95 percent of the judgment paid by the five percent party.

In 1986, the Wyoming legislature abolished joint and several liability by amending W.S. 1–1–109 to provide that a party at fault be required to pay for only his proportionate share of the fault—in the above example, five percent. At the same time, W.S. 1–1–110(b) providing for contribution among tortfeasors was repealed. Wyoming Statute 1–1–109, as now amended, provides in pertinent part:

(d) *Each defendant is liable only* for that proportion of the total dollar amount determined as damages under paragraph (b)(i) or (ii) of this section *in the percentage of the amount of fault attributed to him* under paragraph (b)(i) or (ii) of this section. [emphasis added]

and § 1–1–109(b)(i) and (ii) provides:

(b) The court may, and when requested by any party shall:

(i) If a jury trial:

(A) Direct the jury to find separate verdicts determining the total amount of damages and the percentage of fault at-

tributable to each actor whether or not a party; and

(B) Inform the jury of the consequences of its determination of the percentage of fault.

(ii) If a trial before the court without jury, make special findings of fact, determining the total amount of damages and the percentage of fault attributable to each actor whether or not a party.

By repeal of W.S. 1–1–110(b), the legislature has clearly and unambiguously stated that appellants may not have help paying this judgment by way of contribution from other tortfeasors. If help in paying the judgment is not available by way of contribution, consistency would demand that such help be unavailable by way of a credit upon the judgment. Whether called contribution or credit, we speak of the same thing, *i.e.*, someone else paying part of the judgment.

With the amendment of W.S. 1–1–109(d), W.S. 1–1–110(b) providing for contribution was repealed and for good reason, for after joint and several liability was abolished, no tortfeasor would ever pay more than his proportionate share of a judgment. Thus, there would never be a need for contribution or for credit upon a judgment. Credit would not be given because the amount of judgment for which each defendant is liable is always limited by the percentage of fault assigned to that defendant. Therefore, as a matter of law, Haderlie can have no credit upon the judgment for sums paid by others because Haderlie, if and when he pays 100 percent of this judgment, will not pay more than the "percentage of the amount of fault attributed to him" by the jury in its verdict finding him 100 percent at fault.

The cases we cite to support our conclusion are the only cases that treat the situation existing after repeal of joint and several liability. These cases are the better reasoned and the developing majority in states like Wyoming that have abolished joint and several liability. Of necessity and as a matter of law, they differ substantially from states still retaining joint and several liability and contribution among tortfeasors. A recent Arizona case is nearly identical to this case. *See Roland v. Bernstein*, 171 Ariz. 96, 828 P.2d

1237 (App.1991) (review denied May 5, 1992). This Arizona court reaches a result identical to that reached by us. In *Roland,* the plaintiff sued a neurosurgeon, an anesthesiologist, and the hospital. The anesthesiologist and the hospital settled for $700,000 each. *Roland,* 828 P.2d at 1238. The neurosurgeon and his professional corporation remained in the case for trial. The jury awarded $1,965,000 damages and apportioned fault as follows: neurosurgeon 47 percent; anesthesiologist 28 percent; and the hospital 25 percent. *Id.* The trial court allowed the neurosurgeon to reduce the total judgment by the amount of the prior settlements. Thus, the trial court subtracted from $1,965,000 (the judgment) $1,400,000 (the settlement) and entered judgment for $565,000 instead of $923,550 (47 percent of the $1,965,000). The Arizona Court of Appeals reversed the trial court, and the Arizona Supreme Court denied review. *Id.*

*Roland* was tried under a recent Arizona statute in which the Arizona legislature, as did the Wyoming legislature, abolished joint and several liability and limited recovery against any defendant to that percentage of the plaintiff's damages representing that defendant's degree of fault. *Id., citing* A.R.S. § 12–2506. The court stated that under the new statute, there is no contribution because "each defendant is liable only for the portion of the injury he caused, not the whole injury; no two are liable for the same injury." *Roland,* 828 P.2d at 1239 (*citing Kussman v. City and County of Denver,* 706 P.2d 776 (Colo.1985)). The rationale of the court of appeals is persuasive:

> [W]e believe that it would be anomalous to give the benefit of an advantageous settlement, not to the plaintiff who negotiated it, but to the nonsettling tortfeasor. Had plaintiff made a disadvantageous settlement, she would have borne that consequence because her recovery against [the neurosurgeon] would have been limited to $923,550. At a minimum, symmetry requires that if the disadvantage of settlement is hers so ought the advantage be. Beyond that, we see no reason why a nonsettling tortfeasor ought to escape the liability that is his by reason of the faulty assessment of probabilities by a settling

tortfeasor. Indeed, such a rule might well discourage settlement by the last tortfeasor on the reasoning that his exposure is limited to his degree of fault and even that might be reduced by reason of preexisting settlements. These considerations have led most courts considering this question to apply the rule we are adopting.

*Roland,* 828 P.2d at 1239.

We have acknowledged that guidance in interpreting the Wyoming legislation can be found in court decisions from states which have, like Wyoming, based their statute on Wisconsin's. *Board of County Comm'rs v. Ridenour,* 623 P.2d 1174, 1190 (Wyo.1981). Minnesota's comparative negligence statute was adopted from Wisconsin's. *Id., see also Ferguson v. Northern States Power Co.,* 307 Minn. 26, 239 N.W.2d 190, 196 (1976).

Minnesota faced a similar argument, that credit for settlements with other defendants should be given for the benefit of the nonsettling defendant. While Minnesota has adopted Wisconsin's basic comparative negligence scheme, it has not, as in Wyoming, abolished joint and several liability. Minn. Stat.Ann. § 604.02 (West Cum.Supp.1991). Instead, Minnesota allows the use of a *Pierringer* release which allows a joint tortfeasor under joint and several liability to settle for his share "without fear that the nonsettling defendant will later have a contribution claim against him[.]" *Shantz v. Richview, Inc.,* 311 N.W.2d 155, 156 (Minn.1980).

When settlement is pursuant to a *Pierringer* release, Minnesota has held that a nonsettling defendant is not entitled to credit the amount of settlement from settling defendants against the judgment he must pay. The situation is thus analogous to our case. The Minnesota Supreme Court has said, "we believe it would be inequitable to allow defendant, the nonsettling party, to profit from a settlement agreement between plaintiff and third-party defendant." *Shantz,* 311 N.W.2d at 156. The rationale followed by the Minnesota Supreme Court is relevant here. The Minnesota Supreme Court has said:

> In this case, the settling parties misgauged what the jury's verdict would be and O'Neill's Bar paid "too much" for its

release. This observation, however, is as idle as most hindsight pronouncements. Judged as of the time the settlement was made, weighing the risks as then understood, the settlement amount was "just right." In accepting the settlement payment, the plaintiff accepted the likelihood of being under-compensated as well as being over-compensated. If the jury had determined the amount of the O'Neill's Bar fair share at more than O'Neill paid for its release, the Croatian Club, as the nonsettling defendant, would have been relieved of the obligation of making up the difference. * * * [I]f subsequent events sometimes result in a so-called "windfall" for plaintiff, that result is acceptable within the context of the law's strong policy to encourage settlement of disputes. * * * The nonsettling defendant, hoping the jury would provide a "windfall" which would work to its advantage, would also have a further reason for not settling its own liability exposure.

*Rambaum v. Swisher,* 435 N.W.2d 19, 23 (Minn.1989). *See also Thurston v. 3K Kamper Ko., Inc.,* 482 A.2d 837, 842 (Me.1984).

█ The policy choice is clear. Appellants are liable for 100 percent of the verdict. The jury said so. Appellants are asked to pay that amount, no more. Appellee's contractual settlements with others is not appellants' concern. Common sense, logic and justice tells us that if the injured party must suffer the loss that might result from settlement, he should benefit from the gain. This is the result mandated by law. It is the best result. We hold that entry of the judgment without credit for the payments of the settling parties was proper and in accord with the jury's verdict and Wyoming law.

### Does W.S. 1–1–108 Provide Credit?

The singular question next presented results from an issue we raised and upon which we requested additional briefing and heard argument. It is, does W.S. 1–1–108 (1988) provide for a credit to a party upon a judgment for payments made by another in settlement of the claim of an injured person?

Section 1–1–108 provides as follows:

1–1–108. Voluntary partial payment of liability claims.

No voluntary *partial payment* of a claim based on alleged liability for injury or property damage shall be construed as an admission of fault or liability, or as a waiver or release of claim by the person receiving payment. Such payment is not admissible as evidence in any action for the purpose of determining the amount of any judgment, with respect to the parties to the occurrence from which the claim arose. Upon settlement of the claim, the parties may make any agreement they desire in respect to all voluntary partial payments. *After entry of judgment, any such payment shall be treated as a credit and deducted from the amount of the judgment.* If after partial voluntary payments are made it is determined by final judgment of a court of competent jurisdiction that the payor is liable for an amount less than the voluntary payments already made, *the payor has no right of action for the recovery of amounts by which the voluntary payments exceed the final judgment.* No voluntary partial payments shall be construed to reduce the amount of damages which may be pleaded and proved in a court proceeding *between the parties.* [emphasis added]

It is with some considerable reluctance that we undertake resolution of the right to credit under W.S. 1–1–108, for perhaps it is no longer an issue presented to us by the parties. Appellants, who would benefit from a credit provided by W.S. 1–1–108, stated candidly in oral argument that they could not in good conscience argue that § 1–1–108 provided credit upon the judgment for payment by Sleeping Indian and Anselmi and, in his brief, stated: "Appellants do not contend that Section 1–1–108 of the Wyoming Statutes applies to the payments made by the settling defendants." Appellee also forcefully asserts that W.S. 1–1–108 does not provide credit to appellants upon the judgment for payments by Sleeping Indian and Anselmi. We could stop here, but failure to resolve the issue would be a disservice to citizens and the bar of Wyoming.

■ Before W.S. 1–1–108 became an issue in this case, practitioners in the tort field generally accepted § 1–1–108 as providing a means for a potentially liable defendant or his insurance carrier to pay medical bills and other damages immediately after an injury and during recovery without the necessity of the injured party filing a legal action. The statute is beneficial to an injured party who can receive partial payments of medical bills, lost earnings and other loss promptly without using his own funds, borrowing, or facing bankruptcy for large medical expense he is unable to pay. It is beneficial to the potentially liable party who can aid the injured person during recovery, act reasonably, maintain good relations with the injured person, and perhaps settle the claim, avoiding the substantial cost and expense of litigation and trial. Thus, W.S. 1–1–108, when it uses the plural "parties," clearly refers only to the injured party and the "payor" settling party. There is not a reference or a hint of reference in the language of W.S. 1–1–108 that it also establishes rights of third parties who are not payors and have given nothing to the injured party. The statute then protects the party paying (payor) by providing a credit for all payments and prohibiting use of voluntary payment to establish liability. It protects the injured party in allowing litigation if settlement is not achieved.

Yet we must concede that the following language in the statute, "[a]fter entry of judgment, any such payment shall be treated as a credit and deducted from the amount of the judgment," taken out of context, can have two meanings. The credit might be available only to the party paying (payor), or credit "deducted from the amount of the judgment" may refer to any judgment against any other person. If we accept the claim of two possible interpretations, the statute is ambiguous, and we must proceed to ascertain the intent of the legislature in its enactment. Our rules of statutory interpretation and construction are well established.

> In interpreting statutes, if the statutory language is clear and unambiguous, we must abide by the plain meaning of the statute. *Adobe Oil & Gas Corporation v. Getter Trucking, Inc.*, Wyo., 676 P.2d 560 (1984). If a statute is ambiguous, however, we will resort to general principles of statutory construction in the effort to ascertain legislative intent. *State v. Sodergren,* Wyo., 686 P.2d 521 (1984). A statute which is uncertain and susceptible of more than one meaning is ambiguous. *McArtor v. State,* Wyo., 699 P.2d 288 (1985). In addition, we have said that "[s]tatutes should be given a reasonable, practical construction." *State Board of Equalization v. Cheyenne Newspapers, Inc.,* Wyo., 611 P.2d 805, 809 (1980). Further, "all portions of an act must be read in pari materia, and every word, clause and sentence of it must be considered so that no part will be inoperative or superfluous," *Hamlin v. Transcon Lines,* Wyo., 701 P.2d 1139, 1142 (1985), and a statute should not be construed to render any portion of it meaningless, *Reliance Ins. Co. v. Chevron U.S.A. Inc.,* Wyo., 713 P.2d 766 (1986), or in a manner producing absurd results, *State v. Sodergren,* supra.

*Story v. State,* 755 P.2d 228, 231 (Wyo.1988).

■ First, W.S. 1–1–108 discloses an intent to encourage partial voluntary payments by potential tortfeasors to injured persons as a positive step toward settlement of the claim. The statute provides for protection of the parties' interests in that making partial payments and negotiations resulting in such partial payments (a) are not to be construed as an admission of fault; (b) are not admissible as evidence in any action for the purpose of determining the amount of any judgment; and (c) such payments are treated as credits if a larger judgment is entered. A strong public policy has always existed in Wyoming favoring settlement of litigation. *Coulter, Inc. v. Allen,* 624 P.2d 1199, 1202–03 (Wyo. 1981); *Hursh Agency, Inc. v. Wigwam Homes, Inc.,* 664 P.2d 27 (Wyo.1983).

■ Next, the statute, in providing that partial payments are not admissible in evidence for the purpose of determining the amount of judgment, surely would refer to a judgment against the payor and evidences a legislative intent that credit only belongs to a defendant who makes the voluntary partial payment. Other defendants would have no need to be protected from the use of the

voluntary payment in determining the amount of the judgment. Indeed other defendants might want to use evidence of such payments to shift liability and fault to codefendants.

■ The next clear indication of legislative intent that this statute applies only between a party paying and a party being paid is found in the language dealing with voluntary payments that are less than the amount of the judgment and voluntary payments which exceed the amount of the judgment. If the voluntary payments are less than the amount of the judgment, clearly it is the payor who is entitled to credit for his payments. And if the amount of the judgment is less than the voluntary payments, it is the payor who is clearly identified as having no right of credit or recovery back. Thus, W.S. 1–1–108 specifically states:

> If after partial voluntary payments are made it is determined by final judgment of a court of competent jurisdiction that the *payor* is liable for an amount less than the voluntary payments already made, the *payor* has no right of action for the recovery of amounts by which the voluntary payments exceed the final judgment. [emphasis added]

The specific use of the term "payor" suggests that, throughout the statute, reference to parties is a reference to payors, *i.e.*, parties paying, and refers to the amount of a judgment entered against a "payor." The "payor" under the statute must remain in the case for there to be a judgment against him, and it would be strange indeed if his voluntary payment was credited against the total judgment and not first against his portion thereof. Thus, the clear legislative intent is that the voluntary payments accrue only to the benefit or detriment of the payor of voluntary payments. The statute makes no mention of third parties who pay nothing as being either benefitted or harmed by the party paying and the injured party.

The statute specifically provides that the person who made the voluntary payments (payor) cannot recover the excess amount of the payments (surely a windfall to the injured party). It stretches credulity to even suggest that, in spite of a prohibition against

getting back an overpayment of total damage, it would be proper for other defendants, who chose not to make any such payments, to be able to recover the same sum by means of a deduction "from the amount of the judgment."

The statute, when read in its entirety and in view of its purpose, demonstrates a clear legislative intent that credit for voluntary payments be made only against the amount of the judgment entered against a "payor."

### Introduction of Pleadings or Settlement Agreements As "Judicial Admissions"

■ Objections to appellants' offer into evidence of the pleadings and settlement agreements of Anselmi and Sleeping Indian Outfitters were sustained. These documents were offered in an apparent attempt to establish negligence on the part of Anselmi and Sleeping Indian Outfitters. Appellants argue that the trial court should have admitted prior pleadings and settlement agreements as "judicial admissions." The admission of evidence at trial is within the sound discretion of the trial court and evidentiary rulings will not be disturbed absent an abuse of discretion. *Waggoner v. General Motors Corp.*, 771 P.2d 1195, 1200 (Wyo.1989); *L.U. Sheep Co. v. Bd. of County Comm'rs*, 790 P.2d 663, 673 (Wyo.1990).

W.R.E. 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, *is not admissible to prove liability for* or invalidity of *the claim or its amount.* Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. [emphasis added]

Thus, under W.R.E. 408, evidence concerning settlements "is not admissible to prove liability." "Rule 408 is founded on public policy to encourage out of court settlements and is in the nature of a privilege." *Coulter, Inc. v. Allen,* 624 P.2d at 1202 (*citing* the Advisory Committee Note to Fed.R.Evid. 408). The "evidence of an offer to compromise is irrelevant since it may be motivated by a desire for peace, rather than any concession of weakness." *Hursh Agency, Inc. v. Wigwam Homes, Inc.,* 664 P.2d at 36. *See also McInnis v. A.M.F., Inc.,* 765 F.2d 240, 84 A.L.R.Fed. 259 (1st Cir.1985) (citing Advisory Committee Note to Fed.R.Evid. 408). The policy reasons for excluding settlement negotiations are so strong that courts have said "[g]enerally, statements regarding settlement negotiations are considered to be highly prejudicial and are typically sufficient grounds for a mistrial." *Georgia Casualty and Sur. Co. v. White,* 582 So.2d 487, 494 (Ala.1991). New trials are often granted where evidence of settlement was admitted. *See McInnis,* 765 F.2d at 246.

■ Although W.R.E. 408 *does* allow evidence of settlement to be admitted *if not offered to prove liability,* this exception should be used sparingly, with due care. Weinstein's Evidence notes:

> [c]are should be taken that an indiscriminate and mechanistic application of this "exception" to Rule 408 does not result in undermining the rule's public policy objective. The almost unavoidable impact of the disclosure of such evidence is that the jury will consider the offer or agreement as evidence of a concession of liability. * * * The trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations.

2 J. Weinstein, *Weinstein's Evidence* ¶ 408[05] at 408–31 (1991). Because of the potential prejudice "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers." *Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1364 (10th Cir.1987).

■ Appellants contend that the agreements should have been admitted for the jury to correctly apportion fault among the settling and nonsettling defendants. The admission would have been highly prejudicial. The settlement agreements are not evidence of negligence or fault, yet the jury could have interpreted the settlement agreements as an admission of fault of a party not at fault at all. Further, were we to approve the admission of these settlement agreements, there would be a very real risk that parties would be deterred from settling future cases because of a fear that their agreement would be received in evidence and become public knowledge, thereby compromising goals in settling, *i.e.,* not admitting liability in exchange for peace and plaintiff not having liability established detrimental to the continuing case against nonsettling defendants. Thus, attempts at settlement would be chilled. Appellants fail to articulate an acceptable reason for admitting the settlement agreements other than proving liability which is impermissible under W.R.E. 408.

Next appellants contend that they should have been allowed to introduce appellee's original complaint and pleadings which contained the settling defendants as parties. Appellants argue that the pleadings constitute "judicial admissions" that Sleeping Indian Outfitters, Inc. and Paul Anselmi were at fault and should have been admitted under W.R.E. 801(d)(2)(C). W.R.E. 801 relates to hearsay. W.R.E. 801(d)(2)(C) provides:

> (d) *Statements which are not hearsay.*—A statement is not hearsay if:
>
> * * * * * *
>
> (2) Admission by Party–Opponent.—The statement is offered against a party and is * * * (C) a statement by a person authorized by him to make a statement concerning the subject[.]

Appellee alleged negligence on the part of Anselmi and Sleeping Indian Outfitters in the amended complaint. After settlement, the complaint was again amended to allege negligence only of appellants. Under W.R.C.P. 8 [2] a party "may also state as many separate claims or defenses as he has regard-

2. Amended March 24, 1992.

less of consistency[.]" W.R.C.P. 8(e)(2). Therefore, it was proper for appellee to include Sleeping Indian and Anselmi in the original complaint and later amend the complaint to eliminate claimed negligence on their part. Appellee took advantage of the liberal modern pleading rules and pled in the alternative.

■ Appellants cite *Louisell and Mueller* stating that "pleadings, answers to interrogatories, and responses to requests for admissions filed on behalf of a party in a civil action generally qualify as admissions by the party." 4 *D. Louisell & C. Mueller*, § 425, p. 302 (1980 and 1992 Supp.). Although appellants quote *Louisell and Mueller*, they fail to recognize limitations placed upon the introduction of pleadings. W.R.C.P. 8 allows parties to plead hypothetically, inconsistently, and in the alternative. Therefore, when an inconsistency in pleading is present because of the liberal modern pleading rules, use of "the pleading as an evidential admission should be disallowed." *Louisell and Mueller* at p. 306.

■ In a products liability case, the defendant attempted to introduce statements made by the plaintiff in his complaint as judicial admissions. *Whatley v. Armstrong World Indus., Inc.*, 861 F.2d 837, 839 (5th Cir.1988). The Fifth Circuit Court of Appeals found that reliance on the pleadings was not proper because the pleadings "provide little real evidence of the liability of the settling defendants, [and] they provide no evidence upon which a jury could determine the percentage or extent of liability[.]" *Whatley*, 861 F.2d at 839. This argument against admitting pleadings is especially applicable here because the trial court found that the pleadings were in the alternative, were not admissions, and had no probative value. Furthermore, the appellants' attempts to introduce the pleadings into evidence were in reality an attempt to allude to the settlement agreements which were inadmissible. The trial court properly refused admission of the settlement agreements and pleadings.

### Use of Settlement Agreements For Impeachment in Cross–Examination

Appellants next claim that they should have been allowed to use the pleadings and the settlement agreements to cross-examine appellee. The trial court ruled that use of the settlement agreements in cross-examination of appellee was not permissible under W.R.E. 403 because the risk of prejudice in introducing the settlement agreements outweighed their probative value. We leave evidentiary rulings to the discretion of the trial judge, reviewing only whether there has been a clear abuse of that discretion. *Waggoner*, 771 P.2d at 1200. Appellants have not identified a clear abuse of discretion. The trial court properly served the policy behind both W.R.E. 408 and 403 by ruling that the settlement agreements were not available for impeachment during the cross-examination of appellee.

■ Appellants concede this issue in their reply brief. They admit they should not contest the trial court's decision to deny cross-examination of appellee with the settlement agreements because they are not appealing the damage award portion of the verdict. After this significant concession, however, appellants argue that "there were numerous other opportunities during the trial for cross-examination with respect to the pleadings." Appellants do not support this claim with examples in the record where such cross-examination would have been appropriate. They do not advance cogent argument but, rather, unsupported assertion. This court will not review incomplete assertions. Arguments must be reasoned, supported, and refer to the record. As we have said before "[t]his perfunctory argument does not rise to the level of cogent argument supported by pertinent authority, which we have stated many times is a requirement for consideration by this court." *Weisbrod v. Ely*, 767 P.2d 171, 176 (Wyo.1989) (citing *Kipp v. Brown*, 750 P.2d 1338 (Wyo.1988)).

### Advice to Jury Regarding Consequences of its Verdict Under Section 109

Appellants claim that the trial court should have informed the jury of the facts surround-

ing the claim and settlement and the amount of the settlement with Anselmi and Sleeping Indian Outfitters to satisfy its obligation to inform the jury of "the consequences of its determination of the percentage of fault" as required by W.S. 1–1–109(b)(i)(B) (1988).

The phrase in our statute which requires the judge to "[i]nform the jury of the consequences of its determination of the percentage of fault" is atypical. It is not found in states which have a similar comparative negligence statute. *See* Wis.Stat.Ann. § 895.045 (West 1983); Mont.Code Ann. § 27–1–702 (1991); Okla.Stat.Ann. Tit. 23, § 13 (West 1987); Minn.Stat.Ann. § 604.01 (West 1991); N.D.Cent.Code § 9–10–07 (1987).

Wyoming Statute 1–1–109(b)(i)(B) provides:

The court may, and when requested by any party shall:

\* \* \* \* \* \*

Inform the jury of the consequences of its determination of the percentage of fault.

The trial court gave the following instruction to the jury:

### INSTRUCTION NO. 7

The case must be determined on the basis of comparative fault of the parties involved in the occurrence. \* \* \*

\* \* \* \* \* \*

It will be necessary for you to determine the percentage of fault, if any, of each of the parties involved in the occurrence. It also will be necessary for you to determine the amount of damages sustained [by] the plaintiff.

Your findings as to fault will affect the plaintiff's recovery. It is my duty to explain how that may occur.

First, should you determine that if the plaintiff's fault exceeds fifty percent, the plaintiff will not be entitled to recover any damages.

Second, the defendant's liability for damages is limited by the percentage of fault which you determine is attributable to him

and he will only be liable to pay that percentage of the total damages.

In explaining the *consequences of your verdict,* the court has not meant to imply that any of the parties are at fault. That is for you to decide in conformity with these instructions. [emphasis added]

■ Appellants did not object to Instruction No. 7. W.R.C.P. 51[3] provided in part: *At the close of the evidence, or at such earlier time as the court* reasonably *directs,* any party may file written requests that the court instruct the jury on the law as set forth in the requests. A direction by the court that requests be filed prior to the close of the evidence shall not preclude any party from filing any subsequent request necessitated by the evidence and not reasonably anticipated by the party prior to the time of filing. Before the argument of the case to the jury is begun, the court shall give to the jury such instructions on the law as may be necessary and same shall be in writing, numbered and signed by the judge, and shall be taken by the jury when it retires. *No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.* Opportunity shall be given to make any such objection out of the hearing of the jury. [emphasis added]

The purpose of W.R.C.P. 51 is to provide the trial court with an opportunity to correct any potential error by requiring that objections be made before the instructions are given to the jury. *Goggins v. Harwood,* 704 P.2d 1282, 1289 (Wyo.1985).

■ Appellants did present a motion before trial that the trial court instruct the jury concerning the settling defendants on the grounds that the jury was entitled to know the consequences of its determination as to the percentage of fault. Appellants' motion was not presented at the close of evidence, per W.R.C.P. 51, nor did appellants object to Instruction No. 7. The motion, therefore, did not satisfy the requirement of W.R.C.P.

---

**3.** Amended March 24, 1992.

51 and did not adequately make the trial court aware of a potential error in sufficient time to be corrected. The procedural problem with making the objection in the form of a motion preceding the instruction conference, rather than an objection at the instruction conference, is made obvious in this record. We are unable to locate a ruling on this particular motion. Perhaps the trial court considered this motion to be similar to one previously ruled on and therefore assumed it was implicitly denied. Appellants did not request a ruling from the trial court. They may have assumed it had been previously ruled upon as well. The loss of continuity in the handling of this motion makes clear that a motion for a jury instruction cannot take the place of presentation of an alternative instruction or an objection at the instruction conference.

▇▇▇ Even if appellants had not failed procedurally in their opposition to Instruction No. 7, their argument would fail substantively. We hold that Instruction No. 7 was properly given and accurately informed the jury of the consequences of its determination of the percentage of fault as required by W.S. 1–1–109(b)(i)(B).

Appellants' disagreement with the instruction centers on their interpretation of "consequences of its determination of the percentage of fault" in W.S. 1–1–109(b)(i)(B). Under appellants' interpretation, this phrase would encompass informing the jury of the fact and amount of settlement with other entities no longer parties to the litigation. This statutory language has been interpreted in practice as requiring only that the jury be told that if the plaintiff's percentage of negligence is more than 50 percent, the plaintiff will not recover and that a defendant who is liable will only pay in proportion to his percentage of fault. *See* Wyoming Civil Pattern Jury Instructions 10.01A, 10.03A (1988). Instruction No. 7 is nearly identical to Instruction Nos. 10.01A and 10.03A of the Wyoming Civil Pattern Jury Instructions.

In *Coryell v. Town of Pinedale*, 745 P.2d 883 (Wyo.1987), we held that the language allows the trial court to inform the jury of the consequences of its verdict by giving an instruction on the law of joint and several

liability as affected by percentages of negligence. *Coryell*, 745 P.2d at 886. In *Harmon v. Town of Afton*, 745 P.2d 889 (Wyo. 1987), we followed our previous *Coryell* interpretation of the phrase in Section 114.

*Harmon* and *Coryell* were decided under the 1977 version of W.S. 1–1–109 and 1–1–114. *Harmon*, 745 P.2d at 892. In 1986 the legislature eliminated the doctrine of joint and several liability and substituted a provision that "each defendant is liable only to the extent of his percentage of fault as compared to all other actors whether or not parties to the action." Joint Liability—Repeal, 1986 Wyo.Sess. Laws ch. 24.

In *Harmon* and *Coryell* we viewed this phrase as a part of the joint and several liability scheme about which the court should inform the jury. The same reasons for allowing the court to inform the jury of the effect of joint and several liability exist for informing the jury of the effect of a defendant's percentage of negligence under the amended comparative fault scheme.

The jury is to be informed of the consequences of its determination of the plaintiff's percentage of fault, defendant's and other actors' percentages of fault, only in the context of explaining that the court will reduce the amount of damages by the percentage of fault attributed to the plaintiff and that each defendant is liable only for the proportion of total damages determined by the percentage of fault attributed to that defendant. Informing the jury of those consequences is all that the phrase encompasses. In cases in which the jury will determine percentage of negligence of several persons, some parties and some not, care should be exercised to assure that the jury is not left with the impression that plaintiff has, has not, or will not recover from persons not parties to the case before them. This is in accord with W.R.E. 408. If a better public policy would be to inform the jury of more concerning settling defendants, then that ought to be accomplished by amendment to the Wyoming Rules of Evidence or by legislative enactment.

### Appellee's Remark in Closing Argument

■ In closing argument appellee argued:

> no matter how much you find the damages to be, he will recover only the amount that you attribute to the Defendants. Amounts that you attribute to anybody else, to Crittenden or to Anselmi or to Sleeping Indian, he recovers none of that.

Appellants argue that this remark was prejudicial and, as a result, the jury did not accurately understand the consequences of its verdict. No objection was made to this argument at trial. This court has held "improper argument of counsel cannot be raised or urged for reversal in the absence of an objection." *Coryell*, 745 P.2d at 886, *quoting Joly v. Safeway Stores, Inc.*, 502 P.2d 362, 364 (Wyo.1972).

The remark made by appellee at trial was an attempt to explain Instruction No. 7. However, appellee went beyond what was contained in Instruction No. 7 and arguably hinted that appellee can be compensated for his injuries only by appellants. It is true that he can recover compensation in this lawsuit only from appellants. It is not true that he cannot recover from others in another case or has not recovered compensation. This remark was improper, and appellee's counsel should not have made it. If counsel persists in this type of argument, the opposing party, upon timely objection, should be permitted to respond. However, there was no objection here and no effort by appellants to respond in argument. Also, appellants have not demonstrated that this single remark resulted in substantial prejudice to their case. The instructions given did accurately instruct the jury on the law. One sentence in a closing argument in all likelihood escaped the notice of the jury, and since they had the correct law in hand in the form of Instruction No. 7, there was no prejudice. We presume the jury followed the instructions and not a single sentence spoken in closing argument. In addition, Instruction No. 8 required the jury to determine the percentage of fault attributable to Sleeping Indian or Paul Anselmi even though they did not appear or offer evidence. The settling defendants' names appeared on the verdict form. Appellants were afforded the opportunity to argue their negligence. Thus, there was no prejudicial error in the argument.

### Jury Instructions

Appellants tendered the following proposed instructions in relevant part:

### PROPOSED INSTRUCTION NO. [7]

[T]he Plaintiff has the burden of proving by a preponderance of the evidence:

1. That, following the time he struck the horse, Defendant David L. Haderlie breached a duty owed to Plaintiff and was, thereby, negligent;

2. That Defendant Haderlie, by his negligence, increased the risk of harm to which Plaintiff and other motorists were subject after he struck the horse;

3. That the negligence of Defendant David L. Haderlie was a proximate cause of injury and damage to the Plaintiff * * *.

### INSTRUCTION NO. [9]

At the time and place of the accident, Plaintiff James Sondgeroth had a duty to operate his vehicle with ordinary care and to maintain a proper look out as that term is defined to you in other instructions.

At the time and place of the accident, after David L. Haderlie struck the horse, pursuant to Wyoming Statute, he had the following duty:

The driver of any vehicle which collides with or is involved in an accident with any vehicle or other property which is unattended resulting in any damage to the other vehicle or other property shall immediately stop and shall immediately either locate and notify the operator or owner of the vehicle or other property of his name, address and the registration number of the vehicle he is driving or shall attach securely in a conspicuous place in or on the vehicle or other property a written notice giving his name, address and the registration number of the vehicle he is driving. Every stop shall be made without obstructing traffic more than is necessary.

David L. Haderlie had no duty to warn James Sondgeroth of the condition which existed on the highway following his non-negligent striking of the horse. However, if you find that David L. Haderlie attempted to come to the aid of James Sondgeroth and other motorists, he had only a duty to not increase the risk of harm to which James Sondgeroth and other motorists were subject following his striking of the horse.

The trial court refused both instructions. This court has consistently recognized that "a party is entitled to have a jury instruction upon its theory of the case but only if such theory is supported by competent evidence." *Bigley v. Craven,* 769 P.2d 892, 894 (Wyo.1989), *quoting Short v. Spring Creek Ranch, Inc.,* 731 P.2d 1195, 1199 (Wyo.1987). We find that the evidence in this case did not support the theory under which appellants offered either instruction and they were thus properly refused by the trial court.

With proposed Instruction No. 7, appellants were attempting to instruct the jury on the standard of care owed by a volunteer who comes across a dangerous situation. Appellants cited *Ellsworth Bros., Inc. v. Crook,* 406 P.2d 520 (Wyo.1965). However, the circumstances in *Ellsworth* which invoked a volunteer standard of care were not present here. In *Ellsworth,* Crook saw the cattle on the road and was "herding them back to the owner's property[.]" *Ellsworth,* 406 P.2d at 523. Crook moved the cattle as a volunteer and unlike Haderlie did not have a duty to do so because he was not involved in creating the danger. Therefore, we find that appellants' proposed Instruction No. 7 was properly refused.

Instruction No. 9 was based on the statutory duty of a driver in an accident as found in W.S. 31–5–1104 (1989). The trial court rejected proposed Instruction No. 9 stating "[t]he statutory section cited pertains to striking an unattended vehicle or property, and it relates to the driver's duty to the owner of that vehicle or property and does not relate to the duty [to] other motorists. It is inapplicable, for those reasons, and is not being given." The trial court's refusal of both proposed instructions was not error.

Appellants also contend that the trial court erred in refusing to give the following "sudden emergency" instruction which appellants offered:

Where a person finds himself or herself confronted with a sudden emergency, which was not brought on about his or her own negligence or want of care, such person has a legal right to do what appears to him or her at the time he or she should do, so long as he or she acts in a reasonable manner as any other person would have done under like or similar circumstances, to avoid an injury; and if he or she does so act, he or she will not be deemed to have been negligent even though it might afterwards be apparent that some other course of action would have been safer.

The trial court refused the instruction and reasoned that:

This Court does not deem that there has been any evidence of a sudden emergency. That's more applicable to a driver's suddenly finding someone in his own lane, or a spot of ice that he's onto, or something very immediate. In this case, there was an attenuation of approximately ten minutes of time from the time that Mr. Haderlie struck the horse until the Plaintiff struck the horse; and the Court does not deem that to be a sudden emergency.

The trial court's reasoning is logical and supported by this court's case law. *See Holly Sugar Corp. v. Perez,* 508 P.2d 595, 601 (Wyo.1973). Mr. Haderlie knew of the dangerous condition for a period of time, at least a minute and a half, before the second accident which negates any showing that an unknown or unforeseen condition arose unexpectedly. *Holly Sugar,* 508 P.2d at 601. All three instructions were properly refused because they were not adequately supported by the evidence or the law, and the ruling of the trial court was correct.

### Percentage of Fault was Supported by the Evidence

Appellants contend that the jury verdict finding appellants 100 percent at fault was not supported by the evidence. We begin our examination of their contention

with our standard of review for fact findings of a jury:

> We assume the evidence in favor of the successful party to be true, leaving out of consideration entirely the evidence in conflict, and assigning every favorable inference to the evidence of the successful party that can be reasonably and fairly drawn from it. In addition, when reviewing a jury verdict, we leave to the jury the duty of ascertaining the facts, reconciling conflicts therein and drawing its own inferences if more than one inference is permissible.

*Woodbury v. Nichols,* 797 P.2d 556, 558 (Wyo.1990), *quoting Crown Cork & Seal Co., Inc. v. Admiral Beverage Corp.,* 638 P.2d 1272, 1274–75 (Wyo.1982). After a careful and thorough review of the record, we find that the jury's apportionment of fault was supported by substantial evidence. Appellants argue that, because of the evidence presented, the jury should have found at least some percentage of fault attributable to the settling defendants. Several facts in the record defeat this contention.

There was evidence to show that settling defendant Anselmi did not have notice that there was a defect in his fence because the horses had been successfully contained in that fence for the two weeks prior to the accident. In addition, there was evidence that when Paul Crittenden of Sleeping Indian, Inc. learned of the break in the fence the night of the accident, he repaired the fence that same evening.

The jury's determination that appellants were 100 percent at fault is supported by the record. In our review of appellant's testimony it is likely that the picture he painted of the events was not found credible by the jury. He explained one series of events in his deposition and a different version upon direct examination. Plaintiff's counsel seemed to be successful in impeaching appellant on the inconsistencies, thus making the jury doubt his credibility. In addition, there was evidence that one minute and thirty seconds passed from the time appellant saw appellee's headlights approaching before appellee hit the horse. The question of the proximate cause of the accident was before the jury. The jury most likely determined that there was sufficient time for appellant to have warned the oncoming vehicle, and had he warned him, the second accident would not have occurred. In sum, we find that the evidence in the record is sufficient to support the jury's assignments of percentage of fault in this case.

### Conclusion

This jury's finding two settling defendants 0 percent at fault and the nonsettling defendant 100 percent at fault was supported by the evidence. Appellants are not entitled to credit for the settlement reached between the plaintiff and the settling defendants and therefore must pay the judgment as rendered. None of the errors alleged substantiated appellants' claim that they did not receive a fair trial. They had the opportunity to argue the fault of the settling defendants, and the jury nevertheless found otherwise. Appellants may not benefit from a settlement by the plaintiff with actors not parties in the case.

Affirmed.

THOMAS, J., filed a dissenting opinion.

THOMAS, Justice, dissenting.

I must dissent from the majority opinion in this case. I am satisfied the intent of the Wyoming legislature is being frustrated rather than implemented. The assumption that the Wyoming legislature would abrogate joint and several liability to assure a joint tortfeasor never pays more than his pro rata share of damages and, at the same time, intend that an injured person should receive $205,000 more than the total damages as determined by the jury does not ring true for me. Consequently, I offer my thoughts with the hope they may be of some use to the legislature in correcting the inequities the majority has injected into our system of tort litigation by this decision. In addition, I am satisfied plain error is present with respect to the jury instructions, and the case should be reversed for that reason, as well as for the failure to implement legislative policy.

I identify the following areas of concern in this case:

1. The failure of the majority to recognize plain error did occur in the jury instructions referring to parties, when the statute clearly requires reference to actors.

2. The failure to credit the amounts paid by the actors who settled against the determination of damages by the jury, thus approving a double recovery, which the legislature must have assumed it was foreclosing when it amended WYO.STAT. § 1–1–109 in 1986 to abolish joint and several liability and at the same time did away with the statutes providing for contribution.

3. The failure of the majority to construe consistently WYO.R.EVID. 408 and WYO. STAT. § 1–1–108 by applying the rule to non-parties while limiting the application of the statute to parties.

4. The failure of the majority of the court to implement the legislative intent that a tortfeasor would not pay more than that person's percentage share of the damages as determined by the jury.

The major fallacy found in the majority opinion lies in this statement from page 6 of the slip opinion:

> With the amendment of W.S. 1–1–109(d), W.S. 1–1–110(b) providing for contribution was repealed and for good reason, for after joint and several liability was abolished, no tortfeasor would ever pay more than his proportionate share of a judgment.

If the situation is analyzed in terms of damages rather than judgments, it is obvious that, in this instance, Haderlie or Sleeping Indian or Anselmi or, perhaps, all of them have paid more than a proportionate share of the damages. It is an evasion of the issue to contend that perhaps the total damages were more than $375,000 because we must rely on the determination of that figure by the jury.

In this case, the analysis is made substantially more difficult by plain error that occurred in the jury instructions. It must be remembered Sleeping Indian and Anselmi no longer were parties to the litigation after settlement was accomplished. Nevertheless, the jury was advised in Instruction No. 7 as follows:

> The case must be determined on the basis of comparative fault of the **parties** involved in the occurrence.

> \* \* \* \* \* \*

> It will be necessary for you to determine the percentage of fault, if any, of each of the **parties** involved in the occurrence. It also will be necessary for you to determine the amount of damages sustained [by] the plaintiff.

> Your findings as to fault will affect the plaintiff's recovery. It is my duty to explain how that may occur.

> First, should you determine that if the plaintiff's fault exceeds fifty percent, **the plaintiff will not be entitled to recover any damages.**

> Second, the defendant's liability for damages is limited by the percentage of fault which you determine is attributable to him and he will only be liable to pay that percentage of the total damages.

> In explaining the consequences of your verdict, the court has not meant to imply that any of the **parties** are at fault. That is for you to decide in conformity with these instructions. (Emphasis added.)

The word "parties" in the second and last paragraphs clearly refers only to Sondgeroth and Haderlie, the plaintiff and defendant, respectively. The jury was **never told** to determine the fault, if any, of any other "actor whether or not a party."

The correct treatment of these matters is set forth in WYO.STAT. § 1–1–109 (1988) as follows:

Comparative negligence.

(a) Contributory negligence shall not bar a recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if the contributory negligence of the said person is not more than fifty percent (50%) of the total fault. Any damages allowed shall be diminished in proportion to the amount of negligence attributed to the person recovering.

(b) The court may, and when requested by any party shall:

(i) If a jury trial:

(A) Direct the jury to find separate special verdicts determining the total amount of damages **and the percentage of fault attributable to each actor whether or not a party;** and

(B) Inform the jury of the consequences of its determination of the percentage of fault.

\*      \*      \*      \*      \*      \*

(d) Each defendant is liable only for that proportion of the total dollar amount determined as damages under paragraph (b)(i) or (ii) of this section in the percentage of the amount of fault attributed to him under paragraph (b)(i) or (ii) of this section.

The failure of the trial court to couch the instructions in the terms of the statute constitutes plain error in this instance and, for a correct result to be achieved, even under the majority analysis, a reversal is demanded.

Haderlie's persistent efforts to apprise the jury of the existence of these two "actors" should have been treated as a request to the court to give the directive to the jury to apportion fault among all "actors." Placing the horse owner and pasture owner on the verdict form with no explanation as to their being "actors," while at the same time instructing the jury to apportion liability only among the parties, structured an unacceptable result. This feature, alone, serves to distinguish this case from *Roland v. Bernstein,* 171 Ariz. 96, 828 P.2d 1237 (Ct.App. 1991), relied upon by the majority. It is obvious a correct instruction was provided to the jury in that case. Glossing over this significant deviation from the statutory mandate on the ground Haderlie failed to object to it evades the responsibility of this court to rationally develop the law. Even worse is the suggestion that it is a proper instruction in the face of glaring departures from statutory requirements.

Additionally, the fourth paragraph of the instruction quoted above, telling the jury that if Sondgeroth is determined to be over fifty percent at fault he cannot recover **any** damages, implies Sondgeroth will receive no remuneration at all, if he should not recover from Haderlie, because Haderlie is the only other "party" to the lawsuit. Adding insult to injury is Sondgeroth's attorney's remark in his closing argument "explaining" the trial court's instruction in paragraph four:

If you attribute 50 and a half percent of the fault to Jim [Sondgeroth], he's going to get **nothing.**

The second thing is that no matter how much you find the damages to be, **he will recover only the amount that you attribute to the Defendants.** Amounts that you attribute to anybody else, to Crittenden or to Anselmi or to Sleeping Indian, **he recovers none of that.** He gets the percent times the damages that you attribute to the Defendants.

So, if you put in there two percent, and you have $100,000 of damages, he will get $20,000, period, in the sum. You just need to be aware of the effect of your verdict, and I want you to know that. (Emphasis added.)

Even the majority states "care should be exercised to assure that the jury is not left with the impression that plaintiff has, has not, or will not recover from persons not parties to the case before them." At 716. Obviously, care was not taken in this regard. The result, in this case, was that the jury apportioned 0% fault to both Sleeping Indian and Paul Anselmi and 100% fault to Haderlie.

In light of this explanation of the impact of the erroneous instruction, the failure to credit the amounts paid by the settling actors becomes much more critical. The instructional error would be cured by such a credit.

The legislature now has departed from a rational and comprehensive statutory scheme, even though it was arbitrary and complex in some of its aspects. It has left us essentially with a legislative policy that:

Each defendant is liable only for that proportion of the total dollar amount determined as damages under paragraph (b)(i) or (ii) of this section in the percentage of the amount of fault attributed to him under paragraph (b)(i) or (ii) of this section.

Wyo.Stat. § 1–1–109(d).

The product of the legislative adjustments has led this court to adopt a common law

indemnity rule in part because the legislature did away with our earlier contribution statute. *Schneider Nat'l, Inc. v. Holland Hitch Co.*, 843 P.2d 561 (Wyo.1992). In this regard, it is noted California has held that the common-law equitable indemnity doctrine should be modified to permit, in appropriate cases, a right to partial indemnity under which liability among multiple tortfeasors may be apportioned on a comparative negligence basis. *American Motorcycle Ass'n v. Superior Court of Los Angeles County*, 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899 (1978). Having invoked common law indemnity in *Schneider*, I am satisfied this court must develop a rational and comprehensive plan for the actors collectively to pay the total damages. I am satisfied our history and our precedent leads to the ineluctable conclusion that there is only one recovery for the damages to an injured person. The ceiling on that "pot of gold" is the damages awarded by the jury. The "pot of gold" can be no larger than that, in this instance, $375,-000. The next task is to determine how those who are perceived to be responsible for a plaintiff's injuries must contribute to the payment of those damages.

In *Schneider*, we held, when one of those actors achieves a settlement with the plaintiff, even though the damages were not determined by a jury, that actor can seek to be indemnified by others perceived to be responsible. It is logical the same result should flow if the actor proceeds to a jury determination of those damages rather than agreeing with the plaintiff as to the amount. In this instance, we have a situation in which the others achieved a settlement with the plaintiff and, in accordance with *Schneider*, those settling actors would be entitled to seek indemnity from Haderlie and J.P. Robinson, d/b/a Jack Knife Ranch and Construction, for the amounts they had paid since the jury found them not at fault. The missing factor, of course, is an adjudication among the settling actor or actors and the other actors as to relative fault. I recognize the jury apparently addressed that question in this case, although the jury may have eliminated those who were not parties in the case. It is clear, however, that none of the actors, Haderlie, Robinson, Anselmi, or Sleeping Indian, are bound by that judgment, as among them, because Anselmi and Sleeping Indian were dismissed from the case upon settlement.

The majority completely ignores our decision in *Schneider*. In *Schneider*, this Court agreed with the United States District Court for the District of Wyoming that "indemnity is still available in Wyoming despite the repeal of contribution in 1986." *Schneider*, 146 Cal.Rptr. 182, 843 P.2d at 570. We held that indemnity liability is to be allocated among the parties proportionately to their comparative degree of fault in negligence causes of action. *Schneider*.

From the perspective of this time and these cases, it would seem the legislature was too optimistic in its assumption that the responsibility of the several actors would be settled in one case by one verdict. It is obvious the legislature did not account for the creativity of experienced practitioners at the bar. Any anticipation that the several tortfeasors would agree to hang together is fallacious, and there is a compelling interest by the injured party to see to it that they hang separately.

While the possible combinations are myriad, it is clear from both this case and *Schneider* that it is possible for the parties to avoid having a jury arrive at the apportionment of fault with all parties present and defending their positions. In *Schneider*, the issue never got to a jury. In this case, the issue got to a jury, but Anselmi and Sleeping Indian were not present, and the debate before the jury essentially was only the fault of those who were present in the courtroom. It is easy to understand how a jury could find no fault on the part of those actors who were not even parties to a lawsuit. That is demonstrated by the effective, but inappropriate, argument of counsel for the plaintiff in this case, in which the jury was told, in substance, that Sondgeroth could not recover any portion of his damages from those actors who were not parties. This argument is simply an example of a potential for injustice which must be accounted for in developing rational and cohesive rules for the application of relative fault under our statute.

In *Schneider,* we adopted RESTATEMENT (SECOND) OF TORTS § 886B (1979) to justify our adoption of equitable indemnity. It would be consistent, in this case, to also adopt the RESTATEMENT rule for crediting the settlements against the judgment. RESTATEMENT (SECOND) OF TORTS § 885, at 333 (1979) states:

> Effect of Release of or Payment by or on Behalf of One of Several Tortfeasors
>
> (1) A valid release of one tortfeasor from liability for a harm, given by the injured person, does not discharge others liable for the same harm, unless it is agreed that it will discharge them.
>
> (2) A covenant not to sue one tortfeasor or not to proceed further against him does not discharge any other tortfeasor liable for the same harm.
>
> (3) **A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.** (Emphasis added.)

This rule simply provides for a pro tanto credit of the settlement amounts against the verdict in entering judgment. We have been committed to the RESTATEMENT as a source of common law rules for a number of years. We need to remember that the several rules found in the RESTATEMENT are interwoven and designed to function together. Consequently, it seems appropriate in this situation to turn to the rule set forth in the RESTATEMENT (SECOND) OF TORTS § 885 (1979).

Subsection (3) is further analyzed in Comments *e.* and *f.* as follows:

> *e.* Payments made by one of the tortfeasors on account of the tort either before or after judgment, diminish the claim of an injured person against all others responsible for the same harm. This is true although it was agreed between the payor and the injured person that the payment was to have no effect upon the claims against the other. If the payment is made as full satisfaction for a specified item of damage, the claim against the others is terminated with respect to that item. If it is agreed that the payment is to satisfy the payor's proportion of the total claim, the claim against the others is diminished in that proportion, if this is greater than the amount paid; if the proportion is less than the amount paid, the claim against the others is diminished by the amount paid, irrespective of the agreement.
>
> *f.* Payments made by one who is not himself liable as a joint tortfeasor will go to diminish the claim of the injured person against others responsible for the same harm if they are made in compensation of that claim, as distinguished from payments from collateral sources such as insurance, sick benefits, donated medical or nursing services, voluntary continuance of wages by an employer, and the like. **These payments are commonly made by one who fears that he may be held liable as a tortfeasor and who turns out not to be.** Less frequently they are made by a stranger, who wishes to compensate the plaintiff or to protect one tortfeasor against a possible judgment. The older rule was that the payments did not diminish the claim, which in effect allowed double compensation to the plaintiff on the basis of inconsistent positions taken toward different persons. This has now generally given way to the rule stated, that the claim is diminished if compensation was intended. This is consistent with the general holding as to accord and satisfaction of contracts. (On Subsection (3) in general, see § 920A).

RESTATEMENT (SECOND) OF TORTS § 885, at 335–36 (emphasis added).

The only area of debate which, in either case, assumes prior settlement credit differentiates pro tanto credit and pro rata credit. *Pundzak, Inc. v. Cook,* 500 N.W.2d 424 (Iowa 1993); *Wadle v. Jones,* 312 N.W.2d 510 (Iowa 1981). *See* T.J. Oliver, Annotation, *Manner of Crediting One Tortfeasor with Amount Paid by Another for Release or Covenant Not to Sue,* 94 A.L.R. 352 (1964). *See also Hess Oil Virgin Islands Corp. v. UOP, Inc.,* 861 F.2d 1197 (10th Cir.1988). PROSSER

agrees, stating: "[I]t is. everywhere agreed that the amount received must be credited pro tanto against the amount to be collected." W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 48, at 331 (1984). The Reporter's Note to the RESTATEMENT (SECOND) OF TORTS § 885 states with respect to subsection (3):

> *Subsection (3):* Payments made by the released tortfeasor in partial satisfaction of the plaintiff's claim must be credited to diminish pro tanto the amount of damages recoverable against others not released.

RESTATEMENT (SECOND) OF TORTS APPENDIX § 885, at 164 (1982). In this regard a number of additional cases are cited including *Natrona Power Co. v. Clark*, 31 Wyo. 284, 225 P. 586 (1924).

A persuasive discussion of the general law is found in *Glidden v. German*, 360 N.W.2d 716 (Iowa 1984). That court first determined general comparative law concepts did not change principles of credit resulting from tortfeasor settlement and then determined that the historical Iowa rule of a pro tanto application against the verdict existed. The case is interesting because the Iowa legislature had enacted a pro rata credit provision, which was inapplicable to that particular case, in a section which otherwise was similar to our repealed WYO.STAT. § 1-1-113, but differing in a pro rata proviso rather than pro tanto as our repealed statute provided. Iowa had legislatively moved beyond the Uniform Joint Contribution Act to legislate the pro rata provision. Wyoming has nothing remaining in its statutory scheme that is comparable. By repeal of the statute we have returned to the common law long extant.

There are various methods that are invoked to arrive at a proper award when some, but not all, of the joint tortfeasors have settled, but precedent favors limiting the injured person to a net recovery by subtracting the amount of the settlement from the jury verdict. *See* Jeffrey F. Ghent, *Annotation, Comparative Fault: Calculation of Net Recovery By Applying Percentage of Plaintiff's Fault Before or After Subtracting Amount of Settlement by Less Than All Joint Tortfeasors*, 71 A.L.R.4th 1108 (1989). According to one work specifically addressing the rules surrounding comparative negligence, there are four approaches that can be invoked with respect to the deduction of settlements from a jury's verdict. Each of the four approaches has been invoked by some jurisdiction. JOHN JAMES PALMER & STEPHEN M. FLANAGAN, COMPARATIVE NEGLIGENCE MANUAL § 4.180 (rev. ed. 1974–1986). According to the authors, the first method is to reduce the judgment by the amount actually paid by the settlor; the second method is to reduce the judgment by the percentage share of fault of the settlor; the third method is to reduce the judgment by either the amount stipulated in the settlement agreement or the amount paid in consideration for the release, whichever is greater; and the fourth method is to reduce the judgment by a "reasonable" amount paid in settlement. The authors note that the first method is rarely used, but a respectable minority of jurisdictions that do invoke this method can be identified. These include Arizona (by statute, ARIZ.REV.STAT. ANN. §§ 12–2503 to –2504 (1984)); Maine (*Dongo v. Banks*, 448 A.2d 885 (Maine 1982)); Massachusetts (*Boston Edison Co. v. Tritsch*, 370 Mass. 260, 346 N.E.2d 901 (1976)); Montana (*Boyken v. Steele*, 256 Mont. 419, 847 P.2d 282 (1993)); and West Virginia (*Biro v. Fairmont Gen. Hosp.*, 184 W.Va. 458, 400 S.E.2d 893 (1990)). The second method is to reduce the judgment by the percentage of fault, which is the method used under the comparative fault act. The third method is essentially in vogue in California and New York, and the fourth method is a relatively new approach which does not seem to be followed by courts, although apparently it has been invoked by the Washington legislature.

While perhaps either the first method or the third method would assist the resolution of our dilemma, the first method is exactly what WYO.STAT. § 1-1-108 provides. The third method primarily is used where the Uniform Contribution Among Tortfeasors Act is in place, and our legislature specifically has repealed that statute. It should be noted that the New Mexico Court of Appeals has concluded the second method, also known as the proportionate fault rule, is the best

system to adopt since the contribution statute no longer is in effect. *Wilson v. Galt*, 100 N.M. 227, 668 P.2d 1104 (Ct.App.1983).

Lost in the debate up to this point is Wyo.Stat. § 1–1–108 (1988), which provides:

Voluntary partial payment of liability claims.

No voluntary partial payment of a claim based on alleged liability for injury or property damage shall be construed as an admission of fault or liability, or as a waiver or release of claim by the person receiving payment. Such payment is not admissible as evidence in any action for the purpose of determining the amount of any judgment, with respect to the parties to the occurrence from which the claim arose. Upon settlement of the claim, the parties may make any agreement they desire in respect to all voluntary partial payments. **After entry of judgment, any such payment shall be treated as a credit and deducted from the amount of the judgment.** If after partial voluntary payments are made it is determined by final judgment of a court of competent jurisdiction that the payor is liable for an amount less than the voluntary payments already made, the payor has no right of action for the recovery of amounts by which the voluntary payments exceed the final judgment. No voluntary partial payments shall be construed to reduce the amount of damages which may be pleaded and proved in a court proceeding between the parties. (Emphasis added.)

I recognize that the invocation of this statute is awkward, since even the appellants eschew reliance upon it. I submit, however, that, in the context of the legislative tinkering with the concepts of contribution and joint and several liability, this language is clear and unambiguous. The statute should be dispositive in this case as to whether the amounts paid in settlement should be credited against the judgment. Certainly, the language of the statute supports the proposition that an injured plaintiff is entitled to only one recovery.

The majority argues Wyoming's statute on voluntary partial payment of liability claims applies only to "parties." However, they do concede the statute is ambiguous because the language, "[a]fter entry of judgment, any such payment shall be treated as a credit and deducted from the amount of the judgment," can be interpreted two ways. In this regard, the majority states:

The credit might be available only to the party paying (payor), or credit "deducted from the amount of the judgment" may refer to any judgment against any other person.

Op. at 711.

In finding that a non-settling defendant is not entitled to a credit from others' payments or prior settlements, the majority relies on "court decisions from states which have, like Wyoming, based their statute on Wisconsin's." Op. at 709. In its holding, however, the majority relies primarily on three decisions from the Minnesota Supreme Court as controlling. Because Minnesota has not abolished joint and several liability as Wyoming has done, the majority's reliance on these cases is, at best, speculative and, at worst, artificial. The majority's reliance on *Bernstein* is also misplaced because, in that case, the jury apparently had enough information before it to apportion 28% and 25% fault, respectively, to two actors who settled before trial. Because of the instructional error, the same situation is not involved in this case.

I would opt for interpreting Wyo.Stat. § 1–1–108 to allow any payments by any party or any other "actor" to be credited against a plaintiff's total damage award. This view comports with Wyoming's long-standing policy that a plaintiff is entitled to compensation from all wrongdoers, but with one satisfaction for his damages. *See Day v. Smith*, 46 Wyo. 515, 30 P.2d 786 (1934); *Natrona Power*, 31 Wyo. 284, 225 P. 586; *see also Kirby Bldg. Systems v. Mineral Explorations Co.*, 704 P.2d 1266 (Wyo.1985). Generally, the case law holds that an injured plaintiff is not entitled to a second recovery for payments already made in satisfaction of his total damages. Consequently, I would hold Wyo.Stat. § 1–1–108 requires payments made in partial satisfaction of a plaintiff's claim must be credited against any remaining liability to prevent double recovery. *See also*

*Sanders v. Cole Municipal Finance,* 489 N.E.2d 117 (Ind.Ct.App.1986); *Barker v. Cole,* 396 N.E.2d 964 (Ind.Ct.App.1979).

Moreover, in my opinion the majority's insistence on applying Wyo.Stat. § 1–1–108 solely to the "parties" is more appropriate when construing Wyo.R.Evid. 408 in this case. At the very least, the statute and the rule should be construed consistently. If the statute is limited to parties to the action, the rule should be similarly limited. Wyo. R.Evid. 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The majority construes this rule to preclude evidence of settlements of both parties and non-parties from being presented to the jury unless one of the exceptions applies. However, McCormick takes an antithetical viewpoint:

> The rule is available as an objection to one who made the offer and is a **party** to the suit in which the evidence is offered.

> To invoke the exclusionary rule, there must be an actual dispute, preferably some negotiations, and at least an apparent difference of view between the **parties** as to the validity or amount of the claim. (Emphasis added.)

McCormick on Evidence § 266, at 194 (John W. Strong ed., 4th Practitioner's ed. 1992).[1]

As to the admissibility of settlements with third parties, McCormick states:

A settlement which is offered as proof of the liability of a third party, **arising out of the transaction in suit,** is not within the privilege since the **evidence will not harm the parties to the compromise.** (Emphasis added.)

McCormick on Evidence § 266 n. 24.

A New Jersey court, relying on the above language, had this to say:

> The admission of this evidence [third-party settlement of Firestone] could not undermine the policy of encouraging settlements, because it was not offered against one of the **parties** to the settlement. * * * Stated another way, since Firestone was not a party to the lawsuit and hence could not be held liable, evidence of the settlement was not offered "to prove [Firestone's] liability for the loss" within the intent of Rule 52. *See* McCormick, *supra* [McCormick on Evidence (3 ed. 1984) § 274] at 813 n. 23 ("A settlement which is offered as proof of the liability of a third party, arising out of the transaction in suit, is not within the privilege since the evidence will not harm the parties to the compromise.") (Emphasis added.)

*Wyatt By Caldwell v. Wyatt,* 217 N.J.Super. 580, 526 A.2d 719, 722 (Ct.App.Div.1987).

The facts of our case justify the invocation of this rule. The horse owner and the pasture owner made their "deals" with plaintiff Sondgeroth prior to trial. Unlike an offer to compromise or settlement negotiations which did not culminate in a final settlement agreement prior to trial, these two settlements were entered into by "actors" "arising out of the transaction in suit" who agreed to pay a sum certain in damages to Sondgeroth. Despite disclaimers on the settlement agreements themselves, these settlements evidence some "liability" or responsibility for Sondgeroth's total damages, but only up to the amount offered and accepted by Sondgeroth.

The policy reason for excluding a settlement offer at trial is obvious: It is for the jury to determine liability and damages. This policy is not present when the damages

---

1. In a footnote, however, McCormick acknowledges that "[t]he cases in general do not display much concern as to the basis of the rule." McCormick on Evidence § 266 n. 2.

owed by other "actors" will not be determined by the jury. The horse owner, the pasture owner, and Sondgeroth agreed among themselves what those damages would be and sealed it in a binding contract. At this point, there is no longer an inadmissible, speculative offer to settle which could mislead or prejudice the jury. Rather, this is evidence of a *fait accompli* which "will not harm the parties to the compromise." Accordingly, the existence of these two settlements should have been divulged to the jury because the "actors" who settled with Sondgeroth were not parties to the suit and, consequently, could not be held liable by the jury.

Even if I were to agree that the trial court properly excluded the settlements under WYO.R.EVID. 408, I would still find them admissible as an exception to the rule. The exception portion of the rule states:

> This rule does not require exclusion when the evidence is offered for another purpose, **such as** proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. (Emphasis added.)

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1178 (9th ed. 1983) defines "such" as "of a kind or character to be indicated or suggested." Thus, because the list of exceptions is not exhaustive, I would hold that the existence of the settlement agreements should have been made known to the jury for it to correctly apportion fault among the settling "actors" and the "parties" to the lawsuit—or to state it another way—to prevent anything more than a full, 100% recovery by a successful plaintiff.

I fail to see how the jury's knowledge of these settlements could be prejudicial to the parties in the suit or how such knowledge could chill future attempts at settlement. In fact, in *Frey v. Snelgrove*, 269 N.W.2d 918, 923 (Minn.1978) (citing from *Connar v. West Shore Equip. of Milwaukee, Inc.*, 68 Wis.2d 42, 227 N.W.2d 660, 662 (1975), the court apparently found that the remaining defendants in the lawsuit could be prejudiced without such evidence, when it stated:

> In almost every case the trial court should submit to the jury the fault of all parties, including the settling defendants, even though they have been dismissed from the lawsuit. If there is "evidence of conduct which, if believed by the jury, would constitute negligence [or fault] on the part of the person * * * inquired about," the fault or negligence of that party should be submitted to the jury.

*See also Moser v. Wilhelm*, 300 N.W.2d 840 (N.D.1980).

In any event, I would find the jury was not properly informed of the consequences of its determination of the percentage of fault in this case as required by WYO.STAT. § 1-1-109(b)(i)(B); nor was the jury properly instructed as to its duty to determine the percentage of fault attributable to each **actor** whether or not a party under section (b)(i)(A) of the statute. I would find this latter omission by the trial court, in tandem with the untoward remark by Sondgeroth's attorney in his closing argument, to be plain error requiring reversal and remand.

In 1986, the Wyoming legislature abolished joint and several liability by amending WYO. STAT. § 1-1-109 to provide that:

> (d) Each defendant is liable only for that proportion of the **total dollar amount** determined as **damages** under paragraph (b)(i) or (ii) of this section in the percentage of the amount of fault attributed to him under paragraph (b)(i) or (ii) of this section. (Emphasis added.)

When requested by any party, the plain language of section (b)(i) of the statute commands the court to:

> (A) Direct the jury to find separate special verdicts determining the total amount of damages and the percentage of fault attributable to each **actor whether or not a party;** and

> (B) Inform the jury of the consequences of its determination of the percentage of fault. (Emphasis added.)

Sections (b) and (d) of the amended statute are interrelated and, when read together, the logical inference is that the legislature wanted each responsible "actor," whether or not a

plaintiff or defendant, to be apportioned a percentage of fault by the jury.

The legislature's repeal of joint and several liability came in response to the decision in *Kirby*, 704 P.2d 1266. Apparently, the legislature thought it was inequitable that two tortfeasors, who were found to be 55% negligent, would have to pay 95% of the plaintiff's damages. Thus, with comparative negligence, if a plaintiff cannot recover from one tortfeasor because he is bankrupt, for example, the plaintiff bears the loss and may obtain his damages only from the remaining tortfeasors, if any. In this case, the jury assessed 100% of the fault to defendant Haderlie while two other "actors" agreed before trial to pay $205,000 in damages. This $205,000 accounts for approximately 55% of the $375,000 total damage award. Yet, Haderlie is supposed to pay 100% amounting to the full $375,000 in damages, which includes the 55% payment ($205,000) ascribed and agreed to by others. Thus, as the verdict stands, Haderlie will have to pay 100% of the plaintiff's damages when two other tortfeasors are arguably 55% negligent. This result is *déjà vu* from *Kirby* and, in my opinion, the same perversity the Wyoming legislature was trying to eliminate when it abolished joint and several liability in 1986. Also, after placing the burden of any non-recovery on the plaintiff by abolishing joint and several liability, it would be incongruous if the legislature impliedly authorized a plaintiff to recover 155% in damages at the same time. I cannot believe the legislature intended these anomalies.

The legislature's repeal of Wyo.Stat. § 1-1-110(b), which provided a right of contribution among tortfeasors, clearly was perceived as consistent with the implementation of a system where each responsible party was to pay only his pro rata share of a plaintiff's total damages. Assuming the jury had the requisite knowledge of the other "actors" settlement agreements to be able to apportion some fault to them, application of indemnity liability, I believe, would have achieved a better result. It seems clear, from other jurisdictions which reduce the judgment by the percentage of fault of settling actors, that this knowledge is given to the jury in some form or the settling actors themselves participate in the trial where fault is apportioned.

Because any fault of the settling "actors" was inadmissible at trial, because the jury was not instructed to consider the liability of other "actors" based on settlements totaling $205,000, and because the jury was led to believe Sondgeroth would recover nothing if not from Haderlie, the jury rationally—but inappropriately—attributed all the fault to Haderlie. In any event, someone is going to have to pay more than a proportionate share of the judgment of $375,000, which presumably compensates Sondgeroth completely for his injuries.

If the rule of partial equitable indemnity from *Schneider* is applied correctly, it follows that Haderlie has an action to recover 55% or $205,000 from the settling actors that he would pay on their behalf. If the settling actors had to pay Haderlie back, then they would end up paying $410,000 (double the settlement payments) and should in turn be permitted to seek recoupment from Sondgeroth for $205,000. If Sondgeroth were required to pay the $205,000 to the settling actors, then all have paid the correct amount according to the jury verdict, and we have come full circle. Credit should have been given against the total judgment which would leave only one step, the seeking of common law indemnity from Sondgeroth if, in fact, Anselmi and Sleeping Indian were found not at fault in an action involving them as parties with Haderlie.

I would hold the jury was not properly informed of the consequences of its determination of the percentage of fault in this case as required by Wyo.Stat. § 1-1-109(b)(i)(B); nor was the jury properly instructed as to its duty to determine the percentage of fault attributable to each **actor** whether or not a party under subsection (b)(i)(A) of the statute. I would find this latter omission by the trial court, in tandem with the untoward remark by Sondgeroth's attorney in his closing argument, to be plain error requiring reversal and remand.

In light of what I perceive is a clear, but frustrated, legislative policy, the legislature either should reinstate a statute providing for contribution and indemnity consistent with the policy advanced by abolishing joint

and several liability or it should make clear that rules found in the RESTATEMENT (SECOND) OF TORTS are applicable in Wyoming. This would require the re-enactment of WYO. STAT. § 1–1–108 to clearly provide for crediting of all amounts paid in settlement against any judgment. Hopefully, the legislature will correct the chaotic state of the law this court has structured. The sword of justice is double edged, and any rule that permits the sword to cut in only one direction is inappropriate because the thrust of the rule of law is dulled.